## THE OUACHITA COTTON.

1. The statute of July 13th, 1861, and the subsequent proclamation of President Lincoln under it, which made all commercial intercourse between any part of a State where insurrection against the United States existed and the citizens of the rest of the United States "unlawful," so long as such condition of hostility should continue, rendered void all purchases of cotton from the rebel confederacy by citizens or corporations of New Orleans, after the 6th of May, 1862, from which date the restoration of the national authority had fixed upon them the same disabilities as to commercial intercourse with the territory declared to be in insurrection as it had previously fixed upon the inhabitants of the loyal States.

2. Under the *proviso* of the above-mentioned statute which gave the President power in his discretion to license commercial intercourse, no one else could give licenses. Accordingly, any given by the military authorities were nullities. *The Reform* (8 Wallace, 617), and *The Sea Lion* (Id. 642), affirmed.

3. The title of a purchaser from a citizen of New Orleans, who had himself purchased from the rebel confederacy after the 6th of May, 1862, was not made valid by the fact that such second purchaser was a foreign neutral, purchasing *bonâ fide* for value.

THE case thus entitled was a matter of three appeals from the Circuit Court of the United States for Illinois in a question of 395 bales of cotton which had been seized during the rebellion by a flotilla of the United States. The matter was thus:

An act of Congress of July 13th, 1861, passed soon after the outbreak of the late rebellion, enacts (§ 5) that

"It may and shall be lawful for the President, by proclamation, to declare that the inhabitants of such State, or any section or part thereof where such insurrection exists, are in a state of insurrection against the United States, and *thereupon all commercial intercourse by and between the same and the citizens thereof and the citizens of the rest of the United States, shall cease and be unlawful* so long as such condition of hostility shall continue."

The act proceeds:

"And all goods and chattels, wares and merchandise, coming *from* said State or section into the other parts of the United

States, and all proceeding *to* such State or section by land or water, shall, together with the vessel or vehicle conveying the same, or conveying persons to or from such State or sections, be forfeited to the United States."

The same section also contained this proviso:

"That the *President* may, in *his* discretion, *license and permit commercial intercourse* with any such part of said State or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time, and by such persons, as *he*, in *his* discretion, may think most conducive to the public interest, and such intercourse, *so far as by him licensed*, shall be conducted and carried on *in pursuance of rules and regulations prescribed by the Secretary of the Treasury.*"

On the 16th of August, 1861, the President issued a proclamation, declaring "that the inhabitants of Louisiana and some other States named (except the inhabitants of that part of the State of Virginia lying west of the Alleghany Mountains, and of such other parts of that State and the other States hereinbefore mentioned as might maintain a loyal adhesion to the Union and Constitution, or might be from time to time occupied and controlled by forces of the United States engaged in the dispersion of said insurgents), were in a state of insurrection against the United States, and *that all commercial intercourse between the same and the inhabitants thereof*, with the exceptions aforesaid, and the citizens of other States, and other parts of the United States, *is unlawful*, and shall remain unlawful, until such insurrection shall cease or has been suppressed."

With this statute and this proclamation in force, three distinct parties, American citizens or subjects,—namely, Withenbury & Doyle, The New Orleans Bank, and one Leon Queyrous,—purchased during the rebellion, *but after New Orleans was restored, by capture*, May 6th, 1862, *to the Federal jurisdiction*, a quantity of cotton from the late rebel confederation. The cotton had been raised on the Ouachita, in Louisiana, and in 1862 sold by its owners to the confederation, who left it stored on the plantation where it was raised.

The circumstances under which the three parties above-named purchased respectively from the Confederate government were these :

1. Withenbury & Doyle were citizens of Ohio. The outbreak of the rebellion found them in Louisiana owners and masters there of two steamers running in lawful commerce between New Orleans and Upper Louisiana. Before very long the boats were in the service of the rebel confederacy, —wholly by compulsion, *as was asserted by Withenbury & Doyle*, and against every loyal effort on their part to keep their boats from it. The Confederacy, as in time of war, had seized them, it was alleged, meaning to pay what it deemed a fair price. Being thus indebted to Withenbury & Doyle for the use of the boats, these persons took the cotton (still on the plantation where it was raised) in payment, making the negotiation by which they became owners, with one McKee, an agent of the Confederate government. Such was *their* title to the cotton bought by them.

2. The title of the Bank was thus: On the capture of New Orleans by the forces of the United States, the Louisiana State Bank, a moneyed corporation in that city, found itself with a large amount of Confederate currency on hand, which, as was said, it had been compelled by the rebel confederacy to receive on deposit. It being valueless at New Orleans after the capture, and its effect—if it could be put into circulation in the regions yet under rebel control—being likely to be the yet further discrediting of the rebel credit—while if cotton could be got for it and brought into loyal regions —*that* would add to the resources of these last, *the commander of the United States forces in New Orleans*, in December, 1862, authorized the bank at its desire to dispose of this currency in the purchase of cotton within the rebel lines. Under this permission, an agent of the bank passed through the United States lines into Upper Louisiana, and purchased the cotton in question (or some other which to facilitate transfer he exchanged for it) of a sub-agent of McKee, the agent already named, in August, 1863.

3. Queyrous's purchase was thus: He was a *naturalized*

*citizen of the United States*, residing in New Orleans, and, in March, 1864, purchased the cotton of Buckner, an agent of the Confederate States.

Soon after all this, to wit, in April, 1864, a flotilla of gun-boats of the United States sailed up the Ouachita River, found the cotton still upon the plantation, where it had been raised, and which was in a part of Louisiana then, as, from the origin of the rebellion, it had been, subject to the power of the rebel confederacy—and seizing 935 bales of it, transported it to Cairo, where it was libelled in the District Court there, as prize of war.

Withenbury & Doyle intervened as claimants, on sale of it, to its proceeds, under their title as stated, for the whole 935 bales. A firm named Grieff & Zunts, who had purchased from the bank, came in as succeeding to *its* title for the same total amount; while a French firm, *foreigners, resident in France*, Le More & Co., who had purchased 830 bales from Queyrous, intervened for that proportion of the capture.

By order of the court the claims were consolidated, and having been considered, were dismissed on the ground that the transactions of the original parties, Withenbury & Doyle, the Bank and Queyrous, were " void;" the inhabitants of the loyal and disloyal districts having been rendered incapable of any dealing with each other, so long as the rebellion continued; prohibition being the rule, and license the exception; and the license in this case not having been by the President, who alone was capable of giving one. None of the original parties, therefore, who dealt with the rebels, had any title, and neither Grieff & Zunts, nor the house of Le More in France, who stood in the shoes of two of them, could get through them one that should be different.

The claims of all three intervenors were accordingly dismissed, and *without the question between the captors and the United States having been disposed of*, the correctness of this decree of dismissal was made by this appeal the question now before the court.

The appeals were argued elaborately in this court, by *Mr. R. M. Corwine, representing Withenbury & Doyle; Mr.*

*Goold, representing Grieff & Zunts; and Messrs. Louis Janin and J. A. McClernand, representing LeMore.*   These counsel made common case as against the United States and the captors, and particular case as against each other.   The disposition of the court against all the appellants in common, dispenses with any note of the argument on the latter heads.   As against the United States it was argued—

1. That the property libelled being the property of loyal citizens of the United States, and within their territorial jurisdiction, *inland,* could not lawfully be the subject of capture by the naval forces of the United States as prize of war or otherwise.

2. As long as the rebels held, with the strong hand of war, any of the territory of the United States, to the exclusion of the laws and officers of the United States, that citizens thereof, then in such territory, might lawfully sell to or buy property of those rebels, whether the latter had such transaction individually or under the assumed name of a government; provided, it did not appear that the same was done with the *intention* and for the purpose of aiding such assumed government in its unlawful usurpations.

3. That it was lawful for any parties having *licenses* granted to them by the proper authorities of the United States for that purpose, to carry on trade in the region where this cotton was; and that two of these purchasers had such licenses.

4. That whatever loyal citizens did, in aid of the rebel cause, by compulsion, or in order to avoid military conscription, would not deprive them of their legal and constitutional rights as citizens of the United States.

5. That property acquired as this was, although it remained within the lines of the insurgents, was not stamped with the disabilities of enemy's property, but was entitled to the care of the government so soon as removed beyond the enemy's lines.

6. That the Non-intercourse Act of July 13th, 1861, being in violation of the general rights of the citizens of one State to trade with those of every other, is to be construed strictly;

that it forfeits no goods but those "*coming from said State or section* INTO the other parts of the United States, and all proceeding TO such State." The property must, therefore, be caught in the predicament of *passing* from one State to another.

7. That as respected the case of Le More & Co., especially, it was obvious that whatever might be the case if the cotton had been yet owned by Queyrous, that Le More & Co. being citizens of a foreign and neutral state and purchasers *bonâ fide* for value, held the property discharged of all liability; that certainly as a neutral they could have purchased of the Confederacy directly, and that their right was not impaired by its coming through the channel that it did.

*Mr. Stanbery, A. G., and Mr. Ashton, special counsel of the United States, with Mr. L. Weldon, for the captors*, placed the matter chiefly on the broad principle declared in *Griswold* v. *Waddington*,* as well as in later and in earlier cases.† In the case named, Chancellor Kent thus expressed himself:

" There is no authority in law, whether that law be national, maritime, or municipal, for any kind of private, voluntary, unlicensed business communication or intercourse with an enemy. It is all noxious, and in a greater or less degree it is criminal. Every attempt at drawing distinctions has failed; all kinds of intercourse, except that which is hostile, is illegal. The law has put the sting of disability into every kind of voluntary communication and contract with an enemy, which is made without the special permission of the government. There is wisdom and policy, patriotism and safety, in this principle, and every relaxation of it tends to corrupt the allegiance of the citizen, and prolong the calamities of war."

The act of Congress and the Proclamation were yet over and above this general principle of law.

2. The President alone had power to license; a matter twice decided by this court.‡

---

* 1 Johnson, 483.

† See specially Brown *v.* United States, 8 Cranch, 136; Scholefield *v.* Eichelberger, 7 Peters, 592.

‡ The Reform, 3 Wallace, 632; The Sea Lion, 5 Id. 647.

3. Queyrous having thus had no title whatever, Le More, who got no more than he had, could not have a good one.

Mr. Justice SWAYNE delivered the opinion of the court.

These three cases relate to the same cotton. The several appellants are conflicting claimants, and it will conduce to brevity and clearness in the expression of our views as to the merits of their respective claims, to dispose of all the cases together.

The cotton was seized on the bank of the Ouachita River, in the State of Louisiana, by the naval forces of the United States, in April, 1864. It was sent to Cairo, and libelled as prize of war in the District Court of the United States for the Southern District of Illinois. The court, by an interlocutory decree, directed the cotton to be sold, and the proceeds to be held subject to its order. The decree was executed, and the proceeds are so held. The appellants intervened in that court by filing their petitions. The claim of Withenbury & Doyle, and that of Grieff & Zunts, each, covers all the cotton. Le More & Co. claim 830 bales.

The court below decreed against all the claimants, and ordered their petitions, respectively, to be dismissed. From these decrees the several parties appealed, and the cases are now before this court for final decision.

The original case is still pending in the District Court. No further step in it has been taken. It is there awaiting adjudication. It is not in this court, and we can do nothing which will affect it, further than to dispose of the cases before us. Neither the captors nor the United States have yet been heard in the main case. All questions between them, relating to it, are still in abeyance. If this court should decree in favor of either of the two larger claims in the cases before us, there would be nothing left for the original parties to contend for. The entire *res* of the controversy would be lost to both. If we should sustain the smaller claim and exclude the others, the proceeds of 105 bales of the cotton will remain undisposed of. But if the decrees below shall

be affirmed, the effect will be only to remove from the origi-
nal case the grafts which have been placed upon it by the
parties before us, and thereby to leave it in all respects as
it was before they intervened.

The place where the cotton was seized was, at the time of
the seizure, and had been from the commencement of the
war, insurgent territory. It was raised near the place of
seizure, upon the plantation of Simmons & Tatem, and was
sold by Simmons—who had become the sole owner—to the
rebel government, in the fall of 1862. Payment was made
in Confederate bonds.

Withenbury & Doyle were citizens of the State of Ohio,
but were in Louisiana at the breaking out of the rebellion.
They owned two steamboats, and were engaged in running
them upon the waters of that State. They remained there,
and their boats were largely employed in the rebel service.
They claim to have been thoroughly loyal to the United
States all the time, and that such use of their boats was, on
their part, the result of fear and compulsion, and was inevit-
able.

They bought the cotton in controversy of McKee, the cot-
ton agent of the rebel government, in August, 1863. The
consideration of the purchase was the indebtedness of that
government for the service of the boats. Withenbury says
in his deposition: "The so-called Confederate government
owed me largely for the services of my steamboat, and I re-
ceived from their agent, A. W. McKee, cotton in preference
to Confederate money. This cotton was situated on the
Ouachita and Red Rivers, about equally divided. The
largest quantity in any one place was nine hundred and
thirty-five bales (935), which was stored on the plantation
of Dr. John T. Simmons, on the Ouachita River, below
Monroe." The testimony of McKee, the rebel agent, is to
the same effect. He says: "The services of their boats
ended in 1863, in the month of April. I then agreed to pay
them in cotton if money was not soon forthcoming. . . .
I paid them in the Simmons crop of cotton, on the Ouachita
River. . . There was no contract or bargain made how they

were to be paid, or how much they were to be paid. The boats were required to do the work with the understanding that they would be paid the customary prices. . . . On settlement in the spring of 1863, there was a balance due them, for services rendered under my direction, of between eighty and ninety thousand dollars."

Doyle procured permission from the proper military authorities of the United States, to bring to New Orleans, upon government transports, from Upper Louisiana, 2500 bales of cotton, then lying there, which he claimed belonged to him. The cotton in controversy was a part of it. Before this could be done the cotton in question was seized, removed to Cairo, and libelled as before stated.

Le More & Co. are a commercial house of Havre, in France. They claim 830 bales of the cotton. They purchased through their agent, Jules Le More, on the 1st of March, 1864. The purchase was made of Leon Queyrous, a naturalized citizen, residing in New Orleans. He bought of Buckner, an agent of the rebel government, in the preceding month of February. Possession was delivered by Buckner to Queyrous, and by Queyrous to the agent of Le More & Co.

Grieff & Zunts claim through the Bank of the State of Louisiana. In the fall of 1862, after the capture of New Orleans by the land and naval forces of the United States, the bank having on hand upwards of a million dollars of Confederate money, applied to the military authorities there for permission to send it within the rebel lines, and invest it in cotton. Permission was accordingly given, and an agent was sent to Upper Louisiana with the money. He made large purchases in the country upon the Red River. Finding it impossible to remove the cotton, he exchanged it with the rebel authorities for cotton in the Ouachita District, including, as is alleged, the cotton in controversy. This arrangement was made in 1863. The bank sold to Grieff & Zunts in March, 1864. It is strenuously insisted by the counsel for the other claimants that the proof shows that the contract of exchange did not include the cotton in controversy, that it was conditional, and was subsequently rescinded

by the parties, and that the bank took no title under it. However these things may be, they are immaterial in the view which we have taken of the case. We have, therefore, not found it necessary fully to examine the testimony relating to them. For the purposes of this opinion, it is assumed that the facts are, as they are claimed to be by the counsel of Grieff & Zunts.

The fifth section of the act of July 13th, 1861, authorized the President, under the circumstances mentioned, to declare any State, or part of a State, to be "in a state of insurrection against the United States," and it enacts that thereupon, "all commercial intercourse by and between the same, and the citizens thereof, and the citizens of the rest of the United States, shall cease, and be unlawful so long as such condition of hostility shall continue: . . . . *Provided, however*, that the President may, in his discretion, license and permit commercial intercourse with any such part of such State, the inhabitants whereof are so declared in a state of insurrection, in such articles and for such time and by such persons as he, in his discretion, may think most conducive to the public interest, and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the Secretary of the Treasury."

On the 16th of August, 1861, the President issued a proclamation declaring the rebel States, including Louisiana, to be in a state of insurrection. It excepted several localities from its operation. Among them were such parts of the States mentioned "as may be from time to time occupied and controlled by forces of the United States engaged in the dispersion of the insurgents." By another proclamation of the 2d of April, 1863, the President declared the same States to be in insurrection, and revoked all the exceptions contained in the former proclamation, but again made certain local exceptions, of which "the port of New Orleans" was one. This proclamation declares "that all commercial intercourse, not licensed and conducted as is provided in said act, between the said States and the inhabitants thereof, with

the exceptions aforesaid, is unlawful, and will remain unlawful until such insurrection shall cease or has been suppressed, and notice thereof has been given by proclamation." The date of this proclamation was prior to either of the purchases of the cotton from the rebel agents, to which the claimants, respectively, trace their titles.

The subjugation of New Orleans and the restoration of the national authority there are regarded as having become complete on the 6th of May, 1862. From that time its citizens were clothed with the same rights of property, and were subject to the same inhibitions and disabilities as to commercial intercourse with the territory declared to be in insurrection, as the inhabitants of the loyal States. Such is the result of the application of well-settled principles of public law. The proclamation of the 2d of April, 1863, recognized but did not change the existing condition of things. It was the same afterwards as before. The effect of the proclamation was cumulative.*

The language of the act of 1861, and of the proclamation of 1863, is clear and explicit. There is no room for doubt as to their meaning, nor as to their effect in these cases. Commercial intercourse between the inhabitants of territory in insurrection and those of territory not in insurrection, except under the license of the President, and according to regulations prescribed by the Secretary of the Treasury, was entirely prohibited. As was well remarked in the able opinion of the court below, " Prohibition was the rule, and license the exception." 'No such license was given by the President to either of the parties by whom the purchases of the cotton were made from the agents of the rebel government. Those given by the military authorities were nullities. They conferred no rights whatever. No one could give them but the President. From any other source they were void. The law-making power, in its wisdom and caution, confided this important authority, so liable to be abused, to the Chief Magistrate alone.†

---

* The Venice, 2 Wallace, 258.
† The Reform, 3 Id. 617   The Sea Lion, 5 Id. 642.

Withenbury & Doyle being citizens and residents of Ohio; Queyrous being a citizen of Louisiana, and a resident of New Orleans, and the Bank of the State of Louisiana being a local institution of that city when they purchased, their purchases were all illegal and void, and passed no title to the vendees. Withenbury & Doyle, therefore, never had any title. Queyrous took none, and, therefore, could convey none to Le More & Co. The bank acquired none, and nothing passed by the sale to Grieff & Zunts.

All the parties in this litigation stand before us without any right or interest in the cotton which this court can recognize.

Other questions of fact and of law have been argued with great ability; but as we have found the statute and the proclamation conclusive in every aspect of the cases which can be presented, we have deemed it unnecessary further to examine the subject.

We have found no error in the record.

This conclusion is not in conflict with the ruling in the case of *Mrs. Alexander's Cotton.** Upon that subject it is sufficient to remark that there, the whole case was not, as here, before us.

The several decrees of the District Court are

AFFIRMED.