LINDENBERGER COLD STORAGE & CANNING CO., Limited, v. J. LINDENBERGER, Inc., et al.

(District Court, W. D. Washington, N. D.  July, 1916.)

No. 79.

1. CORPORATIONS ⬨⬨⬨633—OFFICIAL RECOGNITION—ENGLISH COMPANIES ACT.
Under the provision of English Consolidated Companies Act 1908, § 87 (2), that "the registrar of companies shall, on the filing of this statutory declaration, certify that the company is entitled to commence business, and that certificate shall be conclusive evidence that the company is so entitled," a certificate so issued, which is made conclusive evidence of the ultimate right to do business, necessarily includes precedent regularity in all matters both of law and fact, and such right is not open to collateral attack.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2503; Dec. Dig. ⬨⬨⬨633.]

2. CORPORATIONS ⬨⬨⬨34(7)—LEGALITY OF INCORPORATION—ESTOPPEL.
One who acted for incorporators in forming a corporation cannot deny its capacity to sue on the ground that it did not comply with the law in its organization.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 93, 96; Dec. Dig. ⬨⬨⬨34(7).]

3. WAR ⬨⬨⬨16—EFFECT—CONTRACTS.
A contract was made in June, 1914, between complainant, an English corporation, corporations of states of the United States and a German firm for the sale by the American corporations to complainant of property in the United States and Alaska. It contained a further provision by which the American corporations and the German firm guaranteed dividends on the preferred stock of complainant for five years. The contract provided that it should be governed by the law of England. Held, that it was not rendered void by English Trading with the Enemy Acts Dec. 23, 1915, or Jan. 27, 1916, and that complainant could maintain a suit for specific performance against the American parties; no question on the guaranty being involved.

[Ed. Note.—For other cases, see War, Cent. Dig. §§ 80–84; Dec. Dig. ⬨⬨⬨16.]

4. SPECIFIC PERFORMANCE ⬨⬨⬨16—CONTRACTS ENFORCEABLE—EFFECT OF ALTERED CONDITIONS—WAR.
Complainant was organized by the persons owning and controlling the American corporations and another, who, with his father and brother, all German subjects, composed the German firm, and who was to be the managing director of complainant; all the parties were members of the same family. The contract provided for the conveyance, not only of the property, but of the trade-name, good will, and business of the American companies which were engaged chiefly in the fish-packing industry, with their principal market in Germany, through the agency of the German firm, the purpose being to unite all the business in one company and establish a London credit and financial connection. A considerable amount of complainant's stock was allotted to the members of the Ger-

man firm. Relying on the contract a London bank lent complainant $100,000 on its debentures, which was used by the American companies in preparing for the season's business. When the time came, owing to the impending war and its probable effect, such companies refused to transfer the property and business, and an American company was formed, to which they were conveyed instead, thus leaving complainant with no property as security for its debentures. Under English Trading with the Enemy Acts, complainant, if it had entered upon the contemplated business, would have been subject to proceedings to wind it up and to impound the proceeds because of its German stockholders, and their interests could not have been transferred. *Held,* that under such circumstances a court of equity would not decree a specific performance of the contract, but that as a condition of such refusal it would require of defendants, including the new American company, the repayment of the loan to the creditor bank, with contract interest, on equitable terms, and also other expenses connected with complainant's organization.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 29, 35, 36; Dec. Dig. ☞16.]

5. PRINCIPAL AND AGENT ☞107(2)—CONSTRUCTION OF POWER OF ATTORNEY— EXTENT OF POWER GRANTED.

Powers of attorney are strictly construed, and a power of attorney to sell property confers no authority to borrow money.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 315, 366; Dec. Dig. ☞107(2).]

6. PRINCIPAL AND AGENT ☞107(2)—POWER OF ATTORNEY—EXTENT OF POWER GRANTED.

A power of attorney to borrow money does not authorize the attorney to borrow for the use of another than his principal.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 315, 366; Dec. Dig. ☞107(2).]

7. CORPORATIONS ☞30(1)—ORGANIZATION—CONTRACT WITH PROMOTERS.

A contract between the incorporators of a corporation and a promoting syndicate, by which the promoter was to pay all expenses of organization and sell stock of the corporations, and receive payment for its services from the proceeds of the shares sold, *held* not sufficiently certain as to the consideration for such payment as to entitle the promoter to recover from the incorporators, beyond the amount actually expended, where without their fault the purpose for which the corporation was formed could not be carried out, and no stock was sold.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 97; Dec. Dig. ☞30(1).]

In Equity. Suit by the Lindenberger Cold Storage & Canning Company, Limited, against J. Lindenberger, Incorporated, and others. Decree for defendants.

Teal, Minor & Winfree, of Portland, Or., and Oldham & Goodale, of Seattle, Wash., for plaintiff.

Bernstein & Cohen, of Portland, Or., and Jones & Riddell and C. E. Claypool, all of Seattle, Wash., for defendants.

CUSHMAN, District Judge. This is a suit to impress a trust upon certain property held by the defendants, and to compel the specific performance of a contract to convey such property to the plaintiff, for an accounting and general relief. As a condition, upon refusing to appoint a receiver, the court required the deposit in the registry of the court of $23,000. By subsequent payments required, the amount now in the registry of the court is $40,000.

The plaintiff is an English corporation. Defendants are citizens of the states of Washington and Oregon. The plaintiff alleges: That on June 18, 1914, and prior thereto, the corporate defendants and J. Lindenberger, a firm duly registered according to the German law, were carrying on, in conjunction—the proceeds being pooled—certain businesses near the West Coast of the United States, consisting of curing, freezing, and canning fish, general merchandising business and subsidiary businesses in connection with which certain described lands and other property were owned and used. That on such date the first three named corporate defendants, hereinafter called the "Vendor Companies," agreed to sell to complainant the property owned by them and the good will of each, with certain exceptions: Except the book and other debts owing them on the 1st day of June, 1914, that defendants were to discharge all their debts existing on June 1, 1914; furnish plaintiff evidence of title to their properties, defendants to remain in possession to July 30, 1914, maintaining the businesses as going concerns, but should be deemed from the 1st day of June, 1914, to have been carrying on such businesses on behalf of the plaintiff herein, and should respectively account and be entitled to be indemnified accordingly.

The contract was as follows:

"This agreement made the eighteenth day of June one thousand and nine hundred and fourteen, between J. Lindenberger, Incorporated, a company incorporated under the laws of the state of Oregon in the United States of America, the Lindenberger Packing Company, a company incorporated under the laws of the state of Washington in the said United States and the West Coast Trading Company, a company incorporated under the laws of the said state of Washington (which three companies are hereinafter collectively referred to as the Vendor Companies) by Hermann Lindenberger, their attorney of the first part, J. Lindenberger of 31 Georgenkirch Strasse, Berlin, a firm duly registered according to German law, of the second part, and the Lindenberger Cold Storage & Canning Company, Limited (hereafter referred to as the Purchasing Company) of the third part: Whereas the Vendor Companies have their respective headquarters at Seattle in the said United States and for some time past they have each of them been carrying on business at various places on or near to the West Coast of the said United States; and whereas the business so carried on by J. Lindenberger, incorporated, has been the business of catching, freezing, pickling, curing and cold storage of fish and other produce and the manufacture of ice and other subsidiary businesses and the business so carried on by the Lindenberger Packing Company has been the business of packing and canning fish and other subsidiary businesses, and the business so carried on by the West Coast Trading Company has been the business of a general merchandise store and other subsidiary businesses; and whereas all the said businesses have been worked and carried on in conjunction and the profits derived therefrom pooled; and whereas in connection with the said businesses the Vendor Companies or some or one of them are entitled to the lands or rights and privileges over lands of which short particulars are set forth in the schedule hereto; and whereas the Purchasing Company has been formed in England under the Companies Acts 1908 and 1913 with a nominal capital of two hundred and fifty thousand pounds divided into one hundred and twenty-five thousand cumulative participating preference shares of one pound each and one hundred and twenty-five thousand ordinary shares of one pound each, with a view amongst other things to the acquisition of the said businesses; and whereas by clause 3 of the articles of association of the Purchasing Company it is provided that the Purchasing Company shall enter into the agreement therein referred to, being this agreement; and whereas the said J. Lindenberger has agreed to join in these presents for the pur-

poses of entering into the agreement on their part hereinafter contained: Now it is hereby agreed as follows:

"1. The Vendor Companies shall sell and the Purchasing Company shall purchase as from the first day of June one thousand nine hundred and fourteen:

"First, the good will of the said businesses and each of them with the right to use the name Lindenberger as part of the name of the Purchasing Company and to represent the Purchasing Company as carrying on the said businesses in continuation of and succession to the Vendor Companies respectively and all trade-marks and registered labels or brands connected with the said businesses or any of them.

"Secondly, all the lands and rights and privileges over or in regard to lands of which short particulars are set out in the schedule hereto.

"Thirdly, all the plant machinery, office furniture, patents, licenses, horses, wagons, carts, implements, and utensils, ships, barges, boats, launches and scows and the tackle and pulleys connected therewith, all fishing nets and tackle and all other existing and necessary articles of every description requisite for carrying on the business which the Vendor Companies or any of them are, is or may be entitled in connection with the said businesses or any of them.

"Fourthly, the full benefit of all pending contracts and engagements to which the Vendor Companies or any of them are, is or may be entitled in connection with the said businesses or any of them.

"Fifthly, all other property or rights and privileges of every or any description to which the Vendor Companies or any of them are, is or may be entitled in connection with the said businesses or any of them, provided always that there shall be deemed to be excepted out of the sale hereby agreed to be made (first) all the book and other debts owing to the Vendor Companies, or any of them, in connection with the said businesses, or any of them, on the said first day of June, one thousand nine hundred and fourteen, and the full benefit of all securities for such book debts, and (secondly) all cash in hand and at the bank and all bills and notes of the Vendor Companies or any of them in connection with the said businesses or any of them on the same day.

"2. Part of the consideration for the said sale shall be the sum of one hundred and eighty-nine thousand pounds which shall be paid and satisfied as follows, namely: As to the sum of sixty-five thousand pounds by the allotment to the Vendor Companies, or one of them, or their respective nominees, of sixty-five thousand fully paid-up cumulative participating preference shares of one pound each in the capital of the Purchasing Company to be numbered 1 to 65,000, inclusive, and as to the sum of one hundred and twenty-four thousand pounds by the allotment to the Vendor Companies or one of them or their respective nominees of one hundred and twenty-four thousand fully paid-up ordinary shares of one pound each in the capital of the Purchasing Company, to be numbered 1 to 124,000, inclusive. As between the Vendor Companies the said sixty-five thousand preference shares and the said one hundred and twenty-four thousand ordinary shares shall be divided as shown in the following table, namely:

| Name of Vendor Company. | Number of Preference Shares to be Allotted to Each Company or its Nominees and Denoting Numbers of Such Shares. | Number of Ordinary Shares to be Allotted to Each Company or its Nominees and Denoting Numbers of Such Shares. |
|---|---|---|
| J. Lindenberger, Incorporated | 32,000<br>Nos. 1 to 32,000, inclusive | 65,000<br>Nos. 1 to 65,000, inclusive |
| The Lindenberger Packing Company | 30,000<br>Nos. 32,001 to 62,000, inclusive | 54,000<br>Nos. 65,001 to 119,000, inclusive |
| The West Coast Trading Company | 3,000<br>Nos. 62,001 to 65,000, inclusive | 5,000<br>Nos. 119,001 to 124,000, inclusive |

"The residue of the consideration shall be the amount expended by the Vendor Companies, respectively, before the first day of June, one thousand nine hundred and fourteen, in making preparation for the new season's pack over

and above the value of twenty-thousand dollars, which is to be for the benefit of the company. Such amount if not otherwise agreed on is to be determined by a single arbitrator in accordance with the Arbitration Act 1889, provided that the company shall only be called upon to make such payment as and when it receives funds through the sale of its stock.

"3. The Vendor Companies shall undertake to pay and satisfy all their debts and liabilities in connection with the said businesses, or any of them, existing on the said first day of June, one thousand nine hundred and fourteen.

"4. The Vendor Companies shall furnish to the Purchasing Company such evidence as the Purchasing Company shall reasonably require that the Vendor Companies, or some or one of them, have or has a good title to the lands and rights or privileges over land of which short particulars are set out in the schedule hereto, and until such lands and rights and privileges over lands have been vested in or transferred to the Purchasing Company according to American law the said one hundred and twenty-four thousand ordinary shares part of the purchase consideration shall not be allotted to or vested in them.

"5. Copies of the licenses, permits or other documents under which the Vendor Companies are entitled to the rights and privileges, of which short particulars are set out in the second, third, fourth and fifth parts of the said schedule hereto, having been supplied to the solicitors of the Purchasing Company, the purchasing company shall be deemed to have full notice of the contents and effect of such licenses, permits and other documents and of the rights and privileges conferred thereby.

"6. The Vendor Companies shall respectively execute and do, or concur in executing and doing, all such deeds, instruments, acts or things as shall be necessary or reasonably proper to enable the said respective rights and privileges to be vested in or transferred to the Purchasing Company or as it shall direct.

"7. The purchase shall be completed on the thirtieth day of July, one thousand nine hundred and fourteen, at the office at Cecil House, Holburn Viaduct, in the city of London, of Messrs. C. Urquhart Fisher & Co., solicitors, when possession of the premises shall as far as practicable be given to the Purchasing Company, and the consideration aforesaid shall be paid and satisfied subject to the provisions of this agreement, and thereupon the Vendor Companies and all other necessary parties, if any, shall execute and do all assurances and things necessary for vesting the premises in the Purchasing Company and giving to it the full benefit of this agreement as shall be reasonably required.

"8. Possession of the said premises shall be retained by the Vendor Companies respectively up to the said thirtieth day of July, one thousand nine hundred and fourteen, and in the meantime they shall respectively carry on the said respective businesses in the same manner as heretofore and so as to maintain the same as going concerns, and they shall respectively as from the said first day of June, one thousand nine hundred and fourteen, be deemed to have been and to be carrying on such businesses on behalf of the Purchasing Company and shall respectively account and be entitled to be indemnified accordingly.

"9. For the purpose of ascertaining stamp duty payable in respect hereof the property locally situate out of the United Kingdom and the goods, chattels and other effects capable of manual delivery and forming part of the purchase property shall be taken to be of the value of £189,000.

"10. The Vendor Companies and the said J. Lindenberger shall enter into a joint and several covenant with the Purchasing Company for the benefit of the members thereof holding preference shares in the Purchasing Company, guaranteeing that the net profits of the Purchasing Company in respect of the said businesses during each of the five years following the thirty-first day of December, one thousand nine hundred and fourteen, shall amount to such a sum as will enable a dividend of not less than seven per cent. per annum to be paid on the capital for the time being paid up or credited as paid up on the preference shares in the Purchasing Company which may for the time being have been issued, and that if there shall be no profits or a deficiency of profits, in any of such five years the Vendor Companies, or some or one of them, or their

respective successors or assigns, or the said J. Lindenberger, shall immediately after the same shall have been ascertained and notice thereof given to the Vendor Companies, or the said J. Lindenberger, in manner hereinafter provided for, pay to the Purchasing Company in trust for the members thereof for the time being holding preference shares in the Purchasing Company a sum sufficient to make up the amount guaranteed. The certificate in writing of the auditor or auditors for the time being of the Purchasing Company, as to the amount at any time payable under this clause shall as against the respective Vendor Companies or the said J. Lindenberger, be conclusive evidence thereof for the purposes of this clause. Until the said period of five years shall have expired and thereafter until the whole of the amount or amounts (if any) payable under this clause shall have been fully paid and satisfied fifteen thousand of the preference shares and fifty thousand of the ordinary shares in the Purchasing Company to be allotted as part of the purchase consideration shall stand charged with and be a security for the amounts payable under this clause and the certificates for such preference and ordinary shares shall for the purpose of giving effect to such charge be deposited and remain with the bankers for the time being of the Purchasing Company.

"11. The validity of this agreement shall not be impeached on the ground that the Vendor Companies, or any of them, or any director or directors of the Vendor Companies, or any of them, as promoters or otherwise, stand in the fiduciary relation to the Purchasing Company, or that the directors of the Purchasing Company by reason of any of them being a director or directors of or otherwise interested in the Vendor Companies, or any of them, or for any other reason, do not constitute an independent board.

"12. Unless before the thirtieth day of July next the Purchasing Company shall have become entitled to commence business either of the parties hereto may by notice in writing to the other determine this agreement, and such determination shall not give rise to any claim for compensation expenses or otherwise.

"13. Any notice hereunder may be served on the Vendor Companies by sending the same through the post addressed to the Vendor Companies, care of Messrs. J. Lindenberger, 31 Georgenkirch Strasse, aforesaid, and shall be deemed to have been served at the expiration of seven days after the same is posted.

"14. This agreement is to be construed and take effect as a contract made in England and in accordance with the law of England, and the Vendor Companies hereby respectively submit to the jurisdiction of the High Court of Justice in England and hereby respectively appoint Reuters Bank, Limited, of 43 Coleman street in the city of London, and every officer or clerk for the time being of that bank, to be the agent in London of the Vendor Companies, respectively, for the purpose of accepting service on behalf of the Vendor Companies, respectively, of any writ, notice, order, judgment or other legal process or document in respect of any matter arising out of this agreement, and such appointment shall not be revocable, and service of any document on such appointee shall be deemed to be good service on the Vendor Companies, respectively, for all purposes, and the Vendor Companies respectively elect domicile at the registered office of the said bank.

"15. The Purchasing Company shall cause this agreement to be duly filed with the registrar of companies pursuant to section 88 of the Companies (Consolidation) Act 1908, and also in case of shares allotted to the nominees of the Vendor Companies, or any of them, shall cause a sufficient contract to be so filed constituting the title of such nominees.

"16. This agreement is provisional only and is not to become absolute unless and until the company has become entitled to commence business.

"In witness whereof the said Hermann Lindenberger as attorney for and on behalf of J. Lindenberger, Incorporated, the Lindenberger Packing Company and West Coast Trading Company, Incorporated, has hereunto set his hand and seal, and the said Hermann Lindenberger, as a partner in the registered firm of J. Lindenberger duly authorized in that behalf, has hereunto set his hand and seal, and the Lindenberger Cold Storage & Canning Company, Limited, has caused its common seal to be hereto affixed the day and year first above written.

"The Schedule Above Referred to.

"First Part.

## "1. Land and Real Property Owned in Fee Simple.

"Site of cold storage plant in the city of Astoria, county of Clatsop, state of Oregon.

"All of lots numbered three (3) and four (4) in block seven (7) also all and singular the tideland and wharfing rights, privileges and easements north and in front of the said lots numbered three (3) and four (4) to the ships' channel of the Columbia river, all in the city of Astoria as laid out and recorded by John McClure in the said county and state save and except therefrom so much of the above land as was heretofore conveyed by Charles H. Page on the 25th of September, 1900, to one J. J. Kenney, as recorded in Book Forty, page 358, Deeds of Clatsop County, Oregon (being a strip of ten feet north and south and one hundred feet east and west off of the south end of said lots), subject to that certain right of way to the Astoria & Columbia River Railroad Company, executed on the 18th day of April, 1895, by E. C. Crow.

## "2. Freehold Property on Nushagak River, Alaska.

"A piece of land located at Snag Point, Alaska, on the west bank of Nushagak Bay, described as follows: 'Beginning at post at high-water mark on Nushagak river, Alaska, at a place known as Big Petes lot in Fred town at a pine post 3x3 marked No. 1 S. W.; thence to post No. 2 (N. W. 500 W. 365 feet); thence to No. 3 post S. 7600 E. 355 feet; thence to post No. 4 (S. 700 W. 188); thence to No. 1 post S. 8500 W. 218.' The corners of this tract of land are or were marked by posts 3x3 scantling, and marked as follows: 'No. 1 S. W.,' 'No. 2 N. W.,' 'No. 3 N. E.,' 'No. 4 S. E.,' formerly the property of Emil Anderson of Snag Point aforesaid, and sold to J. Lindenberger, Incorporated, by deed dated 27th May, 1910.

"Second Part.

## "Rights and Privileges Over Sites of Cannery Plant.

### "1. Site of Cannery Plant at Craig, Alaska.

"Permission to use a tract of ground lying on the west coast of Prince of Wales Island, described as all that portion of the Craig town site (exclusive of streets) lying between mean high-tide line on the north and west Main street on the south and Third street on east, containing within its limits the original area 600 feet long and 300 feet wide as surveyed and granted under permit of W. A. Langville, February 4, 1908, for mild-cure and cannery purposes for the purpose of maintaining and operating a salmon cannery mild-cure plant and merchandise store under a special use permit dated the 1st April, 1913. Rent payable $100 annually.

"Right to use a flume right of way over a strip of land 8 feet wide extending in an easterly direction from the said cannery at Craig for a distance of 7,780 feet, for the purpose of maintaining a pipe line or flume to convey fresh water under a special use permit dated the 1st January, 1912. No rent payable while public receives use of water free.

### "2. Site of Cannery Plant at Roe Point, Behm Canal, Alaska.

"Right to use 17.23 acres located on the east shore of Behm canal, approximately 3 miles south of Roe point mainland within the Tongass National Forest, Alaska, for the purpose of a commercial fish cannery under a special use permit dated the 16th October, 1911. Rent payable $25 annually.

"Right to use a flume right of way over lands beginning near the left bank of the creek at the intersection of the bank line of the cannery site survey, thence extending up the right bank of the creek a distance of 1,522 feet in length and 25 feet wide an area of .9 acres located on the east shore of Behm canal, approximately three miles south of Roe point mainland and within the Tongass National Forest aforesaid for the purpose of conducting waters to the last mentioned cannery under a special use permit dated the 10th June, 1913. Rent payable $5 annually.

"Third Part.
"Rights and Privileges over Sites of Cold Storage Plant.
"1. Site of Cold Storage Plant and Wharf at Pittsburg (Formerly Black Diamond) State of California.

"Right to erect, construct and maintain a wharf on certain overflowed and submerged lands belonging to the state of California bordering on the San Joaquin river, situated in township number six in the county of Contra Costa, state of California and described as being within the following boundaries, to wit: Beginning at a point where the prolongation of the east line of Black Diamond street in the town of New York Landing intersects the southern shore of San Joaquin slough; thence north 16¾ degrees to ships' channel; thence at right angles westerly 125 feet; thence southerly at right angles 75 feet; thence at right angles easterly 75 feet; thence southerly and on line of the west line of Black Diamond street to the southern shore line; thence at right angles easterly 50 feet into place of beginning, containing an area of 12.000 square feet more or less and situate in Judicial township number six and in Supervisor district number four Contra Costa county, state of California, and to take toll for the use of the same for a term of twenty years under a license or grant of the board of supervisors of the said county of Contra Costa, dated 16th March, 1896.

"Immediately south of and adjoining at the shore line of the Pittsburg property held by franchise a lot owned by J. Lindenberger, Incorporated, description of which is as follows:

"All that certain lot, piece or parcel of land situate, lying and being in the town of Black Diamond, now the city of Pittsburg, county of Contra Costa, state of California and more particularly described as follows, to wit:

"Lot No. 2 in block No. 21 under Hooper's addition to the town of New York Landing (now the city of Pittsburg) in said county of Contra Costa as same is laid down and delineated upon a certain map or plan thereof and filed in the office of the county recorder of said county of Contra Costa on the 10th day of September, 1903.

"This lot is approximately 33 feet on Front street by 75 feet deep extending to the shore line of San Joaquin slough.

"2. Site of Cold Storage Plant at Craig Aforesaid.

"Rights to use the therein described lands situated near and adjoining the Lindenberger mild-cure plant at Fish Egg for the purpose of constructing and operating a fish cannery under a special use permit dated the 14th December, 1911. Rent payable $25 annually.

"Fourth Part.
"Rights and Privileges over Merchandise Store at Craig Aforesaid.

"Right to use a tract of land 264 by 600 feet and erect thereon one cold storage building 30 by 40 feet and a lumber dwelling and store building 16 by 20 feet, located on the North side of Bergman Island near Egg Island at the south end of Klawak inlet on the west coast of Prince of Wales Island, Alaska, for the purpose of conducting a fish curing establishment and a general merchandise store, under a special privilege agreement dated 21st Nov. 1908. Rent payable $20 annually.

"Fifth Part.
"Rights and Privileges in Respect of Fish Trap Locations and Cabin Sites.

"Thirty-one fish trap locations.
"The right to use thirty-one tracts of land, each 300 by 200 feet, as cabin sites under special use permits of various dates. Rent payable $3 annually in respect of each cabin site.                                    Hermann Lindenberger,
                                                                "Agent and Attorney.  [L. S.]

"Signed, sealed and delivered by J. Lindenberger, Incorporated, the Lindenberger Packing Company and West Coast Trading Company, Incorporated, by

Hermann Lindenberger, their attorney, duly authorized in that behalf, in the presence of Kenelm H. H. Smith, Cecil House, Holborn Viaduct, London, E. C., Solicitor.          Hermann Lindenberger,

"Partner of the Firm of J. Lindenberger.   [L. S.]

"Signed, sealed and delivered by the said J. Lindenberger, by Hermann Lindenberger, a partner in such firm duly authorized in that behalf, in the presence of Kenelm H. H. Smith.

"The common seal of the Lindenberger Cold Storage & Canning Company, Limited, was hereto affixed in the presence of Samuel Weiss, A. W. Hajduska, Directors.          William E. Stone, Secretary Pro Tem.   [Seal.]"

It is further alleged that plaintiff has performed its part of the contract, paying the vendor companies £189,000, as part consideration, a part being by the allotment, issuance, and delivery of preferred and common shares of stock in the plaintiff company; that plaintiff has paid the residue of the consideration, that is, the expense, prior to June 1st, of preparing for the new season's pack over and above $20,000; that plaintiff tried to sell its shares, but has received no funds therefor; that this has been prevented by defendants' failure to perform; that plaintiff has made the registration required of it by the contract to entitle it to do business on and after July 30, 1914, and is willing and able to perform its contract; that, after plaintiff had advanced the defendants, and they had expended under paragraph 8 of the contract, $100,000, defendants objected to transferring the legal title of the properties to plaintiff because of conditions growing out of the present European war, finally, on February 24, 1915, refusing to so transfer or surrender possession, or account for the income of the businesses since June 1, 1914; that defendants have conspired to avoid the contract, dissolving the three Vendor Companies, transferring the properties in question to the defendants Bernard Lindenberger and Hermann Lindenberger; that under section 8 of the contract Bernard Lindenberger and Hermann Lindenberger accepted employment with the plaintiff as joint managing directors, taking constructive possession for plaintiff of all the properties alleged to be of the value of $925,000; that these individuals have organized a new corporation, the defendant Lindenberger Packing Company, to which they have, in turn, transferred the property; that this was done without consideration, and with full knowledge on the part of such company of the contract with plaintiff; that defendants' company has conducted the business since June 1, 1914, and refused to account to plaintiff for the funds obtained therefrom.

The defendants J. Lindenberger, a firm registered according to the German law, and Hermann Lindenberger, subjects of Germany, were dismissed by the court from the cause for want of jurisdiction over them.

The Vendor Companies having been dissolved, the Lindenberger Packing Company and Bernard Lindenberger answered the amended complaint, denying generally the merits of the bill of complaint and averring substantially as follows:

That they admit that Hermann Lindenberger is now a resident of the state of Washington, but deny that he was at all the times in question. It is admitted that plaintiff never received any funds from

the sale of stock; that the Vendor Companies prepared to carry out the contract, and that they now refuse to deliver possession of the property described. It is admitted that the Vendor Companies have been dissolved and have transferred their property to the new American company, the Lindenberger Packing Company, which now holds and owns all the property; that such transfer was made with the plaintiff's consent and full knowledge on the part of all persons interested in the new American company of the conditions of the contract above set out, averring that it was with the further knowledge that the contract could not be carried out, and without intent to evade any of its terms. It is further admitted that, since June 1, 1914, defendants have carried on the businesses as the same were before carried on by the Vendor Companies; that they have used the income therefrom and have refused to account to plaintiff therefor.

It is averred that the defendant company is able to respond in damages, and that plaintiff has a full and complete remedy at law for any loss sustained; that the answering defendant company was organized and took over the property because it became impossible to carry out the plan of having the Vendor Companies become one in the English Company; that a meeting of the officers of the plaintiff company was to have been held July 30, 1914, but that all plans of the parties to this action were ended by the beginning of war; that, prior to the beginning of war, Reuters Bank of London advanced to the Vendor Companies £20,000, the greater part of which reached them prior to the beginning of war; that, on account of the impossibility of carrying out the contract on account of the war, to which all parties agreed, new negotiations were had between the representative of plaintiff and Reuters Bank, resulting in an agreement that the Vendor Companies should dissolve, a new American company should be organized to take over the property in question and take care of the money advanced by the bank (evidently meaning thereby to satisfy the bank's claim); that in these negotiations there was a misunderstanding as to the amount of the annual payments to be made the bank, those on one part believing the agreement was $5,000 per annum, and those on the other part thinking it was £5,000; that prior to the meeting of the parties to these negotiations the Vendor Companies had been dissolved, as all parties were informed and approved; that the representative of the bank in these negotiations was to submit the terms of this agreement to his principal; that, in pursuance of the agreement, the Vendor Companies were dissolved, the new American company organized, which took over and still holds all the property of the Vendor Companies, and still conducts the businesses thereof.

The answer avers Reuters Bank to be the only party in interest, and tenders the $23,000 then in the registry of the court in part satisfaction of its claim, tendering a like sum on the 15th day of December of each year until the full amount is paid. It further avers that the defendant Lindenberger Packing Company has assets of over $1,000,000 and debts of less than $350,000; that it would be a hardship and inequitable to be required to repay the bank's claim at one time, or other than as arranged when it was advanced; that, since the war,

Reuters Bank has been compelled to change its name, and is now known as the "British Commercial Bank, Limited."

Defendants pray that an accounting and receivership be denied; that the injunction against the transfer of its property heretofore issued be dissolved; that, upon the payment as tendered and admitted to be owing, the answering defendant companies be decreed fully discharged from all obligations to plaintiff and Reuters Bank; that these payments be for the benefit of the plaintiff or Reuters Bank as their interests may appear; and that the plaintiff be enjoined from obtaining the money in, or to be paid into, the registry of the court until it shall interplead the bank.

The affirmative allegations of the answer and cross-complaint are denied by the plaintiff.

It is clear from the evidence that any negotiations between Kenelm H. H. Smith and the defendants in December, 1914, looking to an adjustment and settlement of differences between the defendants, plaintiff, and Reuters Bank, were not consummated. It is clear that the Vendor Companies have been dissolved, and all their property and interests which were the subject-matter of the contract are now owned and held by the defendant Lindenberger Packing Company, a corporation; that it took the same with full notice and knowledge on its own behalf and all persons interested in it of plaintiff's rights, if any, in such property under its contract with the Vendor Companies. War between England and Germany was declared August 4, 1914.

Only such evidence will be stated as is necessary to apply the court's findings and conclusions. A comprehensive statement will not be attempted.

[1, 2] Defendants' first contention is that the plaintiff company was never authorized to do business and, consequently, to maintain this suit under the express terms of the sixteenth section of the contract. In order to obtain the certificate from the registrar entitling the company to transact business, which certificate is referred to in the evidence as the "blue certificate," it was represented to the registrar of joint-stock companies that the qualification shares of certain of the directors had been paid for in cash, whereas this was not true. Section 87 of the Consolidated Companies Act of 1908 provides:

"(2) The registrar of companies shall, on the filing of this statutory declaration, certify that the company is entitled to commence business, and that certificate shall be conclusive evidence that the company is so entitled."

The concluding language of this section is very like that of section 17 of the original act of 1862:

"The certificate of incorporation of any company by the registrar shall be conclusive evidence that all the requisitions of this act in respect to registration have been complied with.

No case has been called to the court's attention, interpreting section 87.

Section 17 was under consideration in Re National Debenture & Assets Corporation (1891) 2 Chanc. 505, where it was held, in effect, that the certificate, while conclusive as to the incidents of registra-

tion—that is, the regularity of the procedure—was not conclusive as to the jurisdiction of the registrar to issue the certificate; that the law required the signatures of seven to the articles, when only six had signed, and the registrar was deceived as to this, and thereby induced to issue the certificate; that it was not conclusive. This case was reversed upon appeal upon the facts. The appellate court evidently conceded the correctness of the ruling as a matter of law. After this decision, the section was amended to read:

"The certificate of incorporation given by the registrar in respect to any association shall be conclusive evidence that all the requirements of this act in respect of registration or matters precedent or incidental thereto have been complied with and that the association is a company authorized to be registered and duly registered under this act." Section 17, Act of 1908.

It has been argued upon the defendants' part, on the authority of the foregoing case, that, the registrar having been misled by the incorporators' representations that the qualifying shares of stock of certain of the directors were paid for in cash—the registrar being thereby induced to issue the blue certificate—he did not have jurisdiction to issue the certificate, and the plaintiff company never became entitled to transact business. I cannot so hold. While the language of the two sections—17 and 87—is similar, there is this important distinction: Section 17 makes the certificate of incorporation conclusive evidence that all requisitions of the Act in respect to registration have been complied with. The court held, in effect, that the requirement of the act went to procedure, and that fraud was something outside of the act, and that the certificate was not conclusive against it. But the provision of section 87 is not that the certificate shall be conclusive evidence of facts, but that it shall be conclusive evidence of the ultimate right to do business, which necessarily includes precedent regularity in all matters of law and fact.

It is also true that Hermann Lindenberger, acting for the defendants in the incorporation of the plaintiff company, would be presumed to know the law of England, and that, if there was anything wrongful in securing the blue certificate, through him, the defendants are chargeable with it, and cannot take advantage of that wrong.

Defendants' next contention is that the contract became void at the outbreak of the war. This question is also affected by the Trading with the Enemy Acts, passed by Parliament at different times since the beginning of the war. If the contract were alone between subjects of belligerents, opposed in war, it would doubtless be the court's duty to stay, or suspend, proceedings until the conclusion of peace. But the defendants are citizens of the United States, the contract being between citizens of the United States, an English corporation and a German firm. Paragraph 10 of the sales contract provides:

"The Vendor Companies and the said J. Lindenberger shall enter into a joint and several covenant with the Purchasing Company for the benefit of the members thereof holding preference shares in the Purchasing Company guaranteeing that the net profits of the Purchasing Company in respect of the said businesses during each of the five years following the thirty-first day of December, one thousand nine hundred and fourteen, shall amount to such a

sum as will enable a dividend of not less than seven per cent. per annum to be paid on the capital for the time being paid up or credited as paid up on the preference shares in the Purchasing Company, which may for the time being have been issued, and that if there shall be no profits, or a deficiency of profits, in any of such five years the Vendor Companies, or some or one of them or their respective successors or assigns, or the said J. Lindenberger, shall immediately after the same shall have been ascertained and notice thereof given to the Vendor Companies, or the said J. Lindenberger, in manner hereinafter provided for, pay to the Purchasing Company in trust for the members thereof for the time being, holding preference shares in the Purchasing Company, a sum sufficient to make up the amount guaranteed. The certificate in writing of the auditor, or auditors, for the time being of the Purchasing Company as to the amount at any time payable under this clause shall, as against the respective Vendor Companies or the said J. Lindenberger, be conclusive evidence thereof for the purposes of this clause. Until the said period of five years shall have expired and thereafter until the whole of the amount, or amounts (if any), payable under this clause shall have been fully paid and satisfied fifteen thousand of the preference shares and fifty thousand of the ordinary shares in the Purchasing Company to be allotted as part of the purchase consideration shall stand charged with and be security for the amounts payable under this clause and the certificates for such preference and ordinary shares shall, for the purpose of giving effect to such charge, be deposited and remain with the bankers for the time being of the Purchasing Company."

Section 103 of the articles of association of the plaintiff company provides:

"The said Bernard Lindenberger and Hermann Lindenberger shall be the first managing directors and shall hold office as such managing directors for the period of five years from the incorporation of the company if they respectively so long live."

The agreement for sale to the plaintiff company provides:

"14. This agreement is to be construed and take effect as a contract made in England and in accordance with the law of England, and the Vendor Companies hereby respectively submit to the jurisdiction of the High Court of Justice in England and hereby respectively appoint Reuters Bank, Limited, of 43 Coleman street in the city of London and every officer or clerk for the time being of that bank to be the agent in London of the Vendor Companies respectively for the purpose of accepting service on behalf of the Vendor Companies respectively of any writ, notice, order, judgment or other legal process or document in respect of any matter arising out of this agreement, and such appointment shall not be revocable, and service of any document on such appointee shall be deemed to be good service on the Vendor Companies respectively for all purposes, and the Vendor Companies respectively elect domicile at the registered office of the said bank."

It is agreed that contracts entered into prior to the war which, in their future performance, involved trading with the enemy or commercial intercourse with the enemy were rendered void by the outbreak of war; that contracts which have been performed and under which an alien enemy has become indebted to a British subject prior to the war can be enforced by the British subject in a British court, and that an alien enemy's right to enforce a contract with a British subject is suspended during the war.

At common law, an alien enemy was a person of any nationality residing or carrying on business in enemy countries. This common-law definition has been modified by the Trading with the Enemy

Acts, particularly by the Acts of December 23, 1915, and January 27, 1916. The first-mentioned act provides:

"1. (1) His Majesty may by proclamation prohibit all persons or bodies of persons, incorporated or unincorporated, resident, carrying on business or being in the United Kingdom from trading with any persons or bodies of persons not resident or carrying on business in enemy territory or in territory in the occupation of the enemy (other than persons or bodies of persons, incorporated or unincorporated, residing or carrying on business solely within His Majesty's dominions) *wherever by reason of the enemy nationality or enemy association of such persons* or bodies of persons, incorporated or unincorporated, it appears to His Majesty expedient so to do, and if any person acts in contravention of any such proclamation he shall be guilty of a misdemeanor triable and punishable in like manner as the offense of trading with the enemy. * * *

"(3) The provisions of the Trading with the Enemy Acts, 1914 and 1915, and of the Customs (War Powers) (No. 2) Act 1915, and all other enactments relating to trading with the enemy, shall, subject to such exceptions and adaptations as may be prescribed by order in council, apply in respect of such persons and bodies of persons as aforesaid as if for reference therein to trading with the enemy there were substituted references to trading with such persons and bodies of persons as aforesaid, and for references to enemies there was substituted references to such persons and bodies of persons as aforesaid, and for references to offenses under the Trading with the Enemy Acts, 1914 and 1915, or any of those acts, there were substituted references to offenses under this act."

Counsel have informed the court that no case has been found involving the enforcement of an executory tripartite agreement, such as the one in question, where two of the parties are subjects of countries opposed to one another in war—that is, each an alien enemy of the other—and the third party a citizen of a neutral state.

In Janson and Dreifontein Consolidated Mines (1902 Appeal Cases, 484 at 509) the House of Lords held that: "War * * * dissolves all contracts which involve trading with the enemy." In this decision the court relied upon Esposito and Bowden (7 Ellis & Blackburn, 763), which was a case where a neutral shipowner contracted with the defendant, a British subject, to load a cargo at Odessa, a Russian port, for England, before it could be loaded, the Crimean War intervened, in which England and Russia were opposed. It was held that the contract was rendered invalid at the outbreak of war. The court said:

"If an agreement be made to do an act lawful at the time of such agreement, but afterwards, and before the performance of the act, the performance be rendered unlawful by the government of the country, the agreement is absolutely dissolved."

Zinc Corporation, Ltd., v. Hirsch (1916, 1 K. B., at 556) was a case where a German firm had contracted, before the war, to take for a term of years the entire output of zinc concentrates from an English company. For the German firm it was contended, under certain provisions in the contract, that the effect of the war was to suspend delivery until the end of the war. The court held the contract was dissolved by the war, as, were the contention to prevail, the effect would be to store the output for the enemy. The court said:

"The result is that the outbreak of war has dissolved the contract between the parties as far as regards future performance after August 4, 1914. The

remedy of either side for what had previously been carried out remains in abeyance until the termination of the war."

The court, at page 560, said:

"This agreement being incapable of continued performance during the war, the end of which cannot be foreseen, is prima facie dissolved, abrogated, and avoided by the war."

In the Appeal Cases (1916, at page 510) it is said:

"With regard to the effect of a declaration of war, there is certainly, however, one presumption. It has been expressed in various decisions, but it was clearly stated by Lush, J., in Geipel and Smith: 'A state of war must be presumed to be likely to continue so long, and so to disturb the commerce of merchants as to defeat and destroy the object of a commercial adventure like this.'"

To the same effect is Distington Haematite Iron Co. (1916) W. N. 117.

In Porter v. Freudenberg (1915 1 K. B. Division, 857), the question being whether a British subject had the right to sue an alien enemy, the court says (at page 880):

"Prima facie, there seems no possible reason why the law should accord immunity during hostilities to the alien enemy against the payment of just debts or demands due British or neutral subjects. The common law suspending the alien enemies' right of action is based upon public policy, but when considerations of public policy are apparent, it would justify preventing the enforcing of the British neutral subjects to a right of action against the enemy."

In the case of Rex v. Kupfer (1915, Law Journal, King's Bench Division, vol. 84, page 861), it is said:

"The firm became indebted to a neutral in Holland in respect of transactions which had taken place between the Frankfurt partners and the neutral. The neutral looked to the Frankfurt partners for payment, and there was no suggestion that he had threatened legal proceedings against the prisoner in respect to the debt. Acting upon instructions from his Frankfurt partners, the prisoner, after the date of the proclamation, paid the amount of the debt to a firm of foreign bankers in London, who had a branch in Holland, with directions to them to credit the neutral through the Holland branch with the amount paid to them in London, and the foreign bankers did so credit the neutral. He also paid to the London branch of another neutral who carried on business in Rotterdam and London the amount of debt owing by his Frankfurt partners to the neutral in Rotterdam. * * *

"Held, that as the effect of payments to the neutrals was to extinguish the obligations of the Frankfurt partners to pay the debts to the neutrals, the resources of individuals in Germany were, to that extent, augmented and those of Great Britain diminished, and the payments were therefore for the benefit of an emeny, within the meaning of paragraph 5 of the proclamation."

"Held, that the words 'for the benefit of an enemy,' in paragraph 5 of the proclamation, were introduced for the purpose of preventing devices, tactics, and various means by which mercantile houses might seek, but for those words, to make payments indirectly, notwithstanding that there is an express prohibition of a direct payment. The words are very wide, and must be construed to have a very wide application, and are intended to cover the making of payment to an enemy by any device or by any recourse to indirect means."

In Continental Tire Company v. Daimler (1915, 1 King's Bench Division, page 893), the headnote is as follows:

"The plaintiff company was incorporated in England, and carried on business at their registered offices in London. It had a capital of £25,000 in £1 shares. It was formed as a subsidiary company by a German company to promote the sale in the United Kingdom of tires made in Germany by the German company. All its directors were German subjects resident in Germany, and the whole of its shares (except one) were held by German subjects residing in Germany. Held by Lord Reading, C. J., Lord Cozens, Hardy, M. R., Kennedy, L. J. Pillimore, L. J., and Pickford, L. J. (Buckley, L. J., dissenting) that the company did not change its character of an English company because of the outbreak of war; all the shareholders and directors resided in alien enemy country and became alien enemies; that once a corporation has been created in accordance with the requirements of the law, it is an English company notwithstanding that all its shareholders may be aliens; that payment of a debt to a plaintiff company was not a payment to the alien enemy shareholders or for their benefit; and that the right of the plaintiff company to recover in an action brought to recover a debt due to them was therefore not affected by the fact that practically the whole of the shares were held by alien enemies."

This case involved alone the question of the right of the English company to sue. The question of when, if at all, the German stockholders would benefit by the recovery was not before the court. The last decision was rendered prior to the act of January 27, 1916, above referred to, which act provides:

"1. (1) Where it appears to the Board of Trade that the business carried on in the United Kingdom by any person, firm or company, is, by reason of the enemy nationality or enemy association of that person, firm or company, or of the members of that firm or company or any of them, or otherwise, carried on wholly or mainly for the benefit of or under the control of enemy subjects, the Board of Trade shall, unless for any special reason it appears to them inexpedient to do so, make an order either—

"(a) Prohibiting the person, firm or company from carrying on the business, except for the purposes and subject to the conditions, if any, specified in the order; or

"(b) Requiring the business to be wound up."

In the dissenting opinion in the last-mentioned case, it is pointed out that the holding of the majority is contrary to the decision of Justice Marshall in Bank of the United States v. Deveaux, 9 U. S. (5 Cranch), 61, 3 L. Ed. 38.

War is a very practical science. The thing aimed at—both at common law and under statutes—is to prevent assistance in any form reaching the enemy. The opportunity to take something from the enemy is not denied, unless it involves an exchange. Indeed, taking from the enemy is one of the practices, if not the objects, of war.

Under the English law adopted by the contract, and upon which alone this phase of the case has been presented, the English subject may sue and recover from the alien enemy upon contracts which have been performed prior to the existence of war. It would therefore appear that the plaintiff could accept the contract of guaranty, provided for in paragraph 10, as an English subject, and certainly would be permitted to do directly what it could accomplish indirectly by means of a suit.

The contract now before the court does not, therefore, in its performance, directly involve trading with the enemy. That is, the specific performance prayed would not, if such performance was had,

itself be an act of trading with the enemy. If the guaranty of interest and dividends by the German firm, contemplated by section 10 of the contract, were enforced, from the German point of view, it might constitute trading with the enemy, providing the state of war still existed when the guaranty was sought to be enforced. This fact, in my opinion, saves the contract from becoming invalid at the outbreak of war, although it would affect the question of whether the contract was voidable or not and the question of what equity requires under the circumstances—questions to be hereafter considered.

[4] For the defense it is also contended that the foundation and basis of the contract has been destroyed by the outbreak of war; that thereby the contract was "snapped off," leaving the parties remediless, so far as it was concerned, each in the position in which the outbreak of the war found them. The object of the Vendor Companies, in forming the plaintiff company was to unite, in one company, their various businesses, and to establish a London credit and financial connection. Prior to the war, the main trade of the Vendor Companies was with Germany. The plaintiff company was to acquire the trade name of "Lindenberger" and the good will of the Vendor Companies.

The first English case in support of this principle, adopting the Roman law, is Taylor v. Caldwell, 3 B. & S. 826, 32 L. J. (Q. B.) 164, which was a case where a company of entertainers had hired the Crystal Palace for a certain length of time and, after they had given certain performances, it was burned down. The contract was held dissolved, neither party remaining under obligations to the other.

Horlock v. Beal, 1916 Appeal Cases, was a case of a partly executed contract. The dependents of a sailor sued for his wages, the ship, an English vessel, having been detained and confiscated in Germany and the sailor having been arrested and imprisoned in Germany during the course of the voyage. The court said:

"I do not go through all the decisions, but I think it right to mention the case of Krell and Henry, inasmuch as I desire to attach my respectful and pointed concurrence in the opinion delivered by Vaughn Williams, L. J., in this passage: 'Whatever may have been the limits of the Roman law, the case of Nickell and Ashton makes it plain that the English law applies the principle, not only to cases where the performance of the contract becomes impossible by the cessation of existence of the thing which is the subject-matter of the contract, but also to cases where the event which renders the contract incapable of performance is the cessation or nonexistence of an express condition or state of things going to the root of the contract'"

(The case of Krell and Henry, so pointedly approved in the foregoing case, will be considered hereafter.)

It is further said in this case:

"When the deed is sought to be made effectual on an event unexpected to both parties, the party seeking to enforce it is unjust and inequitable in his demand, and when parties have presupposed some facts or rights to exist, or that they will hereafter exist, as the basis of their proceedings, which in truth do not exist or are prevented from happening by unforeseen causes in mutual error, under circumstances material to their character and consequence, the contract is on general principles inoperative and invalid. * * * It will be observed that the contract so dissolved was not a mere executory contract, but a contract in part performed."

Under the contract in the instant case, Hermann Lindenberger, a German subject, was to be a managing director of the plaintiff company. Any enemy subject found in England is liable to internment and, if interned under the Alien Restriction Act, becomes a prisoner of war, and is not entitled to a writ of habeas corpus. This was held in Rex and Vine Street Police Superintendent (1916, 1 K. B. 268), the headnote being as follows:

"A German subject who has obtained his discharge from German nationality, but has not become a naturalized British subject is, under the provisions of German law, in a privileged position, and does not become entirely divested of the rights belonging to the natural born German. He is therefore an alien enemy. The crown is entitled, in the exercise of its prerogative, to imprison an alien enemy, and the King's Bench Division has no jurisdiction to interfere with the exercise of the prerogative. An alien enemy resident in the United Kingdom who, in the opinion of the executive government, is a person hostile to the welfare of this country and is on that account interned may properly be described as a prisoner of war, although not a combatant or a spy, and application by him for a writ of habeas corpus will be refused."

It is manifest that if such treatment were accorded Hermann Lindenberger, his usefulness as a managing director would be greatly impaired.

In Westlake on International Law (2d Ed. pt. 2, pp. 53, 54) it is said:

"While the enemy directors, who cannot continue to fill their places while their duties would be in abeyance, must be regarded as deprived of that character from the outbreak."

In Robinson & Premier Oil Pipe Line, Ltd. (1915, 2 Chancery, p. 124), it is said:

"The learned judge Gray, in the case of Kershaw v. Kelsey, which is reported in 100 Mass. page 561 [97 Am. Dec. 124, 1 Am. Rep. 142], states the law in our opinion correctly when he says, 'The law of nations as judicially declared prohibits all intercourse between citizens of two belligerents which is inconsistent with the state of war between their countries,' but we respectfully disagree with him when he holds that nothing comes within that principle except commercial intercourse. That this transaction is such a contingency is clear. The proposed exercise of the vote is for the purpose of obtaining control and management, or a large voice in them, of a British trading company which owns, amongst other things, large property in the enemy's country, and that this may be to the detriment of the interest of this country and the advantage of the enemy cannot be doubted. We think also that the rejection of these votes may be justified on the narrower ground that this was a commercial transaction. Commercial intercourse is not confined to making contracts between the alien enemy and the British subject, and such a transaction as this, directed to the obtaining control of a trading company, is, in our opinion, commercial. It follows from what has been said that the employment of a British subject as proxy to exercise the voting power is an intercourse between him and the alien enemy which is also prohibited."

What are known as the "Coronation Cases" are a series of cases growing out of contracts entered into, relying upon the taking place of the King's coronation ceremonies, reviews, processions, and the like, which ceremonies did not take place on account of the King's illness. The first of these cases was that of Krell and Henry (1903, 2 K. B. 740), which was a case where a landlord brought action to recover the rent of a room hired from him by certain sightseers, which the sightseers had not used on account of the coronation's not taking

place. It was held that the landlord was not entitled to his rent. The court, at pages 747 to 749, says:

"The real question in this case is the extent of the application in English law of the principle of the Roman law which has been adopted and acted on in many English decisions, and notably in the case of Taylor v. Caldwell. (1) That case at least makes it clear that: 'Where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled unless, when the time for the fulfillment of the contract arrived, some particular specified thing continued to exist, so that when entering into the contract, they must have contemplated such continued existence as the foundation of what was to be done. There, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be considered a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor.' Thus far it is clear that the principle of the Roman law has been introduced into the English law. The doubt in the present case arises as to how far this principle extends. The Roman law dealt with obligations de certo corpore. Whatever may have been the limits of the Roman law, the case of Nickoll v. Ashton (1901, 2 K. B. 126) makes it plain that the English law applies the principle not only to cases where the performance of the contract becomes impossible by the cessation of existence of the thing which is the subject-matter of the contract, but also to cases where the event which renders the contract incapable of performance is the cessation or nonexistence of an express condition or state of things, going to the root of the contract, and essential to its performance. It is said, on the one side, that the specified thing, state of things, or condition the continued existence of which is necessary for the fulfillment of the contract, so that the parties entering into the contract must have contemplated the continued existence of that thing, condition, or state of things as the foundation of what was to be done under the contract, is limited to things which are either the subject-matter of the contract or a condition or state of things, present or anticipated, which is expressly mentioned in the contract. But, on the other side, it is said that the condition or state of things need not be expressly specified, but that it is sufficient if that condition or state of things clearly appears by extrinsic evidence to have been assumed by the parties to be the foundation or basis of the contract, and the event which causes the impossibility is of such a character that it cannot reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made. In such a case the contracting parties will not be held bound by the general words which, though large enough to include, were not used with reference to a possibility of a particular event rendering performance of the contract impossible. I do not think that the principle of the civil law as introduced into the English law is limited to cases in which the event causing the impossibility of performance is the destruction or nonexistence of some thing which is the subject-matter of the contract, or some condition or state of things expressly specified as a condition of it. I think that you first have to ascertain, not necessarily from the terms of the contract, but if required, from necessary inferences, drawn from surrounding circumstances recognized by both contracting parties, what is the substance of the contract, and then to ask the question whether that substantial contract needs for its foundation the assumption of the existence of a particular state of things. If it does, this will limit the operation of the general words, and in such case, if the contract becomes impossible of performance by reason of the nonexistence of the state of things assumed by both contracting parties as the foundation of the contract, there will be no breach of the contract thus limited."

Another one of these cases was Blakeley and Mueller (1903, 2 K. B. 760), a case where an intended sightseer had paid in advance, and, there being no coronation, he did not use the site, but sued to recover his money. It was held he could not do so.

Another case was that of Civil Service Co-operative Society and the General Steam Navigation Company (1903, 2 K. B. page 756). The case, as stated in the headnote is as follows:

"By a charter party dated March 22, 1902, the defendants agreed to let, and the plaintiffs agreed to hire, the defendants' steamer for the term of three days from the hour she was placed at the plaintiffs' disposal in London on the day preceding that of the naval review to be held at Spithead on the occasion of the King's coronation in June or July, 1902. The steamer was to take up passengers at London and Southampton, and proceed to Spithead, arriving in time for the review, and returning to London on the third day of the hiring; and the amount to be paid by the plaintiffs for the hire was a lump sum of £1,500, payable '£250 on signing the charter and the balance ten days before the date of the review.' The usual exceptions from owners' liability in respect of perils of the seas, etc., were contained in the charter party. The plaintiffs paid to the defendants £250 on signing the charter party, and the balance, £1,250, on June 18th, the review having in the meantime been fixed to take place on June 28th. The review was, in consequence of the King's illness, postponed on June 25th, and thereupon notice that the plaintiffs would not require the steamer was given by them to the defendants, and accordingly she was not placed at the plaintiffs' disposal. The defendants, before the postponement of the review, had incurred expenses amounting to £500 in fitting out the steamer and in doing other things by way of part performance of the contract, or in order to enable them to perform it. The review was not held until the month of August, 1902, and the plaintiffs sued the defendants to recover the £1,500 as money paid on a consideration which had failed. At the trial before a judge alone, it appeared that there had been some negotiations for a settlement of the dispute, and the judge expressed his desire that the matter should be left to him to say what, under the circumstances and apart from the strict legal rights of the parties, should be done. The defendants would not agree to that course being taken, and they also declined to accept the judge's suggestion that they should be content to retain the amount of the expenses they had incurred and have their costs. In the result the judge gave judgment for the defendants, but ordered that each of the parties should bear their own costs. Held, on an appeal by the plaintiffs from the judgment for the defendants, that the plaintiffs were not entitled to recover the money they had paid."

Herne Bay Steam Boat Company v. Hutton (1903, 2 K. B. 683) is described in the headnote as follows:

"In consequence of the public announcement of an intended royal naval review at Spithead on June 28, 1902, an agreement in writing was entered into between the plaintiffs and the defendant that the plaintiffs' steamship Cynthia should be 'at the disposal' of the defendant on June 28th to take passengers from Herne Bay 'for the purpose of viewing the naval review and for a day's cruise round the fleet; also on June 29th for similar purposes; price £50 down, balance before ship leaves Herne Bay.' On the signing of the agreement the defendant paid the £50 deposit. On June 25th the review was officially canceled, whereupon the plaintiffs wired to the defendant for instructions, stating that the ship was ready to start, and also requesting payment of the balance. Receiving no reply, the plaintiffs, on June 28th and 29th, used the ship for their own purposes, thereby making a profit. On June 29th the defendant repudiated the contract in toto. During the two days in question the fleet remained anchored at Spithead.

"In an action by the plaintiffs to recover the balance less the profits made by their use of the ship during the two days, held, reversing the judgment of Grantham, J., that the plaintiffs were entitled to recover, because: (1) The venture was the defendant's, the risk being his alone; and (2) the happening of the naval review was not the sole basis of the contract, so that there had been no total failure of consideration, nor a total destruction of the subject-matter of the contract.

"Held, further, that the contract did not operate as a demise of the ship."

It was said in this case (at page 691):

"From the correspondence it appears to me to be clear that this venture was the venture of the defendant alone, and that although the plaintiffs assisted him by selling tickets and posting notices of what was proposed to be done, yet the risk was entirely that of the defendant."

London and Northern Estates, Ltd., v. Schleisinger (1916, 1 K. B., Division, p. 20) is reported in the Current Digest 1915, column 288, as follows:

"By a tenancy agreement dated March 19, 1914, the defendant became tenant to the plaintiff company of a flat at Westcliff-on-Sea for a term of three years from Lady Day, 1914. By the terms of the agreement the defendant was to occupy the rooms only as private dwelling rooms, and was not to assign or underlet without license, such license not to be unreasonably withheld. By the Aliens Restriction (Consolidation) Order 1914, made on September 9, 1914, an alien enemy was prohibited from residing within certain specified areas, which included Westcliff-on-Sea. The defendant was an alien enemy. The action was brought to recover the quarter's rent due under the agreement on Lady Day 1915. The defense was that, before the rent became due, the tenancy was put an end to by the above-mentioned order. The common serjeant held that the prohibition by law of defendant's personal occupation of the premises did not extinguish the tenancy, and he gave judgment for the plaintiffs. The defendant appealed. The Division Court held, affirming the court below, that the personal residence of the defendant, on the demised premises was not the foundation of the contract of tenancy, for he might have derived advantage from them otherwise, as by letting them to a tenant or lending them to a friend, and that the ground for contending that the tenancy was extinguished by the order consequently failed."

The war has so dislocated and broken up the objects and purposes of the contract now in question as to give rise to strong equities in defendants' favor; but there has been, thereby, no such complete destruction of the subject-matter and foundation of the contract as to bring the case within the principle of the case of Taylor v. Caldwell, supra.

In determining whether the nature and extent of the change in condition brought about by the war are such as to warrant the court in refusing to decree specific performance, it is necessary to consider a number of facts, other than those already recited.

The Lindenbergers controlling the Vendor Companies are Bernard and Robert. They have no interest in the Berlin firm. The members of the Berlin firm are Hermann, his father, and another brother. The Lindenbergers of both firms are members of one family. The business established by the Vendor Companies extends into Washington, Oregon, California, and Alaska. The output of these companies, prior to the war, was distributed in Europe mainly by the Berlin firm. The plaintiff company was an agency which the Vendor Companies invoked in order to get their various businesses into one company and to establish financial connections in London. At a meeting of the board of directors, held on June 18, 1914, shares of the company were allotted as follows: 30,000 7 per cent. cumulative preference shares to Hermann Lindenberger; 6,500 7 per cent. cumulative preference shares to Crescole Syndicate, Ltd.; 10,000 7 per cent. cumulative preference shares to Eugen Friedmann, of Berlin; 18,500 7 per cent. cumulative preference shares to Josef Lindenberger, of Berlin. The

remaining 60,000 preference shares were to be sold to the public through the Crescole Syndicate, under an agreement hereafter considered. The ordinary shares allotted were not to be turned over to the Vendor Companies until after the transfer of their property. These shares were then to be allotted: 12,400, by direction of Hermann Lindenberger to Crescole Syndicate; 50,000 to Hermann Lindenberger; 61,600 to Josef Lindenberger.

Hermann Lindenberger and Josef Lindenberger being German subjects and both being members of the German firm, doing business in Germany, and the main part of the trade to be turned over to the plaintiff company being with Germany, jeopardizes, not only the holdings of all interested in the plaintiff company, but the existence of the plaintiff company itself, as, under the Trading with the Enemy Acts, the plaintiff company, if carrying on the business for which it was organized, could be wound up and the interest of alien enemies— which would include the business associates of alien enemies at common law—would be sold and placed in the hands of the public custodian, waiting the end of the war. This result would be made possible by reason of the enemy association attaching to all on account of the connection of Hermann Lindenberger and Josef Lindenberger with the transaction.

Since the war, letters to the defendant company from Denmark and Norway, as well as from England, have been opened by the British censor. Thirty thousand dollars worth of fish shipped by the Vendor Companies to Denmark have been seized as prize, and are now in a prize court in London. The plaintiff company has intervened in the prize court proceeding to claim these goods. I do not consider this action upon the plaintiff's part hostile to the defendant, or in disregard of the proceedings in this court; but this seizure illustrates the peril in which the entire property would be placed should it pass to the plaintiff company, for I have no doubt that it was in great part the foregoing enemy association which caused the seizure.

After the incorporation and the raising of £20,000 for the use of the American businesses and £15,000 delivered to the Berlin firm, a meeting was to have been held in London, July 30, 1914, for the transfer of the property. It is apparent that this meeting was not held because of the realization of impending war. Hermann Lindenberger left England the latter part of July for the United States, landing in New York on the 10th day of August. War was declared August 4th. He came to Seattle directly, where steps were being taken for the dissolution of the Vendor Companies, looking to the transfer of the property to the plaintiff company.

The £20,000 was loaned upon debentures of the plaintiff company, a security under the English law, which, when registered with the registrar at Somerset House became a lien on all the assets of the company. Very soon a question arose as to making these debentures a lien upon the American property. When it was proposed to place a mortgage of record, the Vendor Companies objected upon the ground of the resultant injury to their credit.

A further obstacle in performing the contract was encountered in

the fact that the trap licenses and permits in Alaska could not be transferred to the alien corporation. Another difficulty appeared in the fact that, if the boats of the Vendor Companies passed to the plaintiff company, they would forfeit the right to engage in the coastwise trade. The plaintiff also objected to the dissolution of the Vendor Companies because of a certain guaranty, contained in paragraph 10 of the contract, made in their name by Hermann Lindenberger.

Ways were sought to obviate these difficulties. No agreement could be reached for making the debentures a lien upon the American property. Finally, in December, 1914, the solicitor of plaintiff, who was also solicitor for the London bank which had advanced the £20,000, came to Seattle with a view to an adjustment. A plan was proposed for an American company, instead of an English one, which plan embraced other details to get around the difficulties which had arisen and yet preserve the main features of the agreement. Mr. Smith, the solicitor of the plaintiff and the bank in these negotiations, while approving of the new plan, made it plain that he was without power to bind his principals in this particular and could only recommend its adoption to them. He left the United States in December, 1914, for London, promising to submit the proposed arrangement to his principals and advise the Vendor Companies at an early date of their action. Owing to a "hitch" in the audit of the books of the Vendor Companies—responsibility for which it is not necessary to determine—this answer to the proposition was not given for several months. The proposal was at length rejected. It is not therefore necessary to recite its terms.

The £20,000 loaned by the bank was received by Bernard Lindenberger, president of the Vendor Companies, part of it before the declaration of war and part after; but all of it before the passage of the Trading with the Enemy Acts. None of these acts, nor the proclamations under them, were known to the Vendor Companies prior to November, 1914, at which time, on account of such acts, objection was made by them to the proposed transfers.

Although the stockholders are generally represented by the corporation and the courts will not look through the corporation to the stockholders, it is not always so. When it is made to appear that the interests of the corporation are no longer safe from the fraud of the directorate, a stockholder may sue to protect the rights of a corporation under equity rule 27 (198 Fed. xxv, 115 C. C. A. xxv).

In February, 1915, the Vendor Companies, through their president, Bernard Lindenberger, declined to complete the transfer to plaintiff, giving as a reason therefor the conditions arising out of the war and the Trading with the Enemy Acts. Owing to the dissolution of the Oregon corporation, J. Lindenberger, Incorporated, and the pending dissolution of the other two Vendor Companies and their imperiled status as corporations empowered to do business and sue in the courts, as well as their liability for penalties under the law, the defendant company Lindenberger Packing Company was organized, taking over all the property of the Vendor Companies, the control and interest of the old companies being preserved in the new.

Negotiations continued, looking to an adjustment, until the bringing of this suit November 1, 1915. No want of good faith or laches is chargeable to any one. Neither is the defendant estopped by reason of the acceptance of a portion of the loan for which shares in the plaintiff company were pledged. After the outbreak of the war, the nature and extent of the danger to the interests involved was not at once realized by either party. The stringent, searching and far-reaching Trading with the Enemy Acts had not yet been passed. The parties on both sides hoped for a speedy determination of the war. This latter fact was evidently one reason for delay, after Mr. Smith's return to England, in answering the proposed plan for adjustment made at the Seattle meeting.

If Hermann Lindenberger cannot act upon the board of directors, transfer his shares in the plaintiff company, or obtain dividends earned until after the war, the court is asked to give a German's property to an English company to use, knowing that that company will not pay for its use when due, although it promised so to do, or, if at all, until the conclusion of the war. The Ouachita Cotton, 6 Wall. 521, 18 L. Ed. 935; U. S. v. Grossmayer, 9 Wall. 72, 19 L. Ed. 627; Mitchell v. U. S., 21 Wall. 350, 22 L. Ed. 584. When it comes to determining whether equity requires specific performance of the contract, the court is not greatly concerned with the question whether it is the plaintiff or the government of which it is a creature that proposes to break the contract.

The evidence shows that the main trade of the Vendor Companies, prior to the war, was with Germany; that through the efforts of Great Britain any such trade directly with Germany has been destroyed; that, if any part of it is preserved, it is carried on indirectly through certain houses or agencies in the neutral countries of Norway, Sweden, and Denmark; that several of these houses have been placed, by English authorities, upon the trading with the enemy black list, the effect of which is to give them the status of an alien enemy and prohibit any trading with them by any subject of England, corporate or otherwise. Since the case was tried, this black list has been extended to a number of firms, or companies, of the United States, of which the court takes judicial notice.

Under the contract the plaintiff was to acquire the good will of the Vendor Companies, which would include the German trade. From the circumstances, it is clear that it was the implied understanding that the German trade was to be fostered and preserved. By the outbreak of the war, Trading with the Enemy Acts, proclamations, and black lists, this contract duty of the plaintiff company has not only been destroyed, but the opposite duty has been cast upon it to use its utmost efforts to destroy that trade which it contracted to preserve.

While there are certain facts, if standing alone, that might warrant a finding of a constructive delivery of the property of the Vendor Companies, yet, in view of all the facts and circumstances, it is clear that such was not the intention at any time. On the whole, equity requires, rather, a decree for the payment of the debts incurred than to so greatly jeopardize $1,000,000 worth of property to its

ultimate owners, the Vendor Companies, on account of something over $100,000 that has been advanced on the strength and credit of the plaintiff corporation. 36 Cyc. 617c; 31 Cyc. 1311c.

It is next necessary to consider what, in the nature of alternative relief or terms or conditions should be imposed in denying specific performance.

The £20,000 advanced by Reuters Bank was loaned upon debentures of the plaintiff company. These debentures were given and the money advanced thereon at a time when there was no doubt in the minds of any of the parties that the property of the Vendor Companies would immediately be turned over to the plaintiff company. By direction of the plaintiff company, the money was forwarded by the bank to Bernard Lindenberger, the president of the Vendor Companies, and he was also agreed upon as one of the managing directors of the plaintiff company. The defendant company Lindenberger Packing Company had the benefit of the entire amount. Under these circumstances, it would be wanting in equity not to require of the defendants the payment to the bank of this money, with interest at the contract rate. Certain items of interest have already been paid the bank on this loan. Clearly the plaintiff has no interest in this money to be repaid, other than to see it paid the bank because it was raised on debentures issued by the plaintiff. The immediate payment of this entire amount would doubtless work an unwarranted hardship upon the defendants. I conclude that the terms outlined upon the interlocutory order are fair and reasonable in this respect; that is, that the defendant company be required to pay the British Commercial Bank, Limited (Reuters Bank) at least $23,000 yearly in reduction of the principal, on or before the 15th day of December of each year until paid, interest at the contract rate of 7 per cent. from July 9, 1914, to be paid semiannually. Either the injunction in existence against the disposition of any assets of the defendant company, except in the ordinary course of trade, should be continued in effect, or a bond required of defendant for the deferred payments; this matter to be determined on settling the decree.

The evidence shows, as stated, that plaintiff has asserted a claim to $30,000 worth of fish in prize proceedings not yet concluded in London. The payment of the last $30,000 of the amount due the bank will not be made until after the final determination of the prize court proceedings, and, if the plaintiff should be successful in its assertion of the claim in those proceedings, it will be required to either turn over the fish to the defendants or account to the defendants for the proceeds; this matter to be settled upon the signing of the decree.

The creditor, Reuters Bank, now British Commercial Bank, is not a party to this litigation. The decree is therefore not conclusive upon it. The court in its interlocutory order, as a condition of denying a receivership, required the deposit by the defendants in the registry of the court of certain sums, now amounting to $40,000. Unless this money is accepted by the bank and an agreement made for the full discharge by it of the defendants on account of this deben-

ture loan, upon the final payment as herein decreed, or an appeal taken, each to be within a reasonable time, then the money now held in the registry of the court should be returned to the defendants. Unless the plaintiff also releases the defendants from any claim on account of the debenture loan, the bank will be required, if accepting the money, to give a bond to hold the defendants harmless, should the plaintiff appeal upon this question, against the results of such appeal.

It has been further contended that, in case of the denial of specific performance, the defendants should be required to repay the £15,000 delivered by the bank to the Berlin firm of J. Lindenberger. Several days after the contract of June 18th for the sale of the properties—that is, on June 25th—the loan of £15,000 was obtained upon the following instrument:

"This indenture, made the twenty-fifth day of June, one thousand nine hundred and fourteen, between J. Lindenberger, Incorporated, a company incorporated under the laws of the state of Oregon in the United States of America, the Lindenberger Packing Company, a company incorporated under the laws of the state of Washington in the said United States of America, and West Coast Trading Company, Incorporated, a company incorporated under the laws of the said state of Washington (hereinafter called the Borrowers) of the first part, Hermann Lob Lindenberger, of Berlin in the German Empire, but now residing at the Hotel Cecil, London, merchant of the second part, Bernard Lindenberger, of Seattle, Washington, aforesaid, merchant of the third part, J. Lindenberger, of 31 Georgenkirch Strasse, Berlin, aforesaid, a firm duly registered according to German law, by the said Hermann Lindenberger, a member of that firm of the fourth part, and Reuters Bank, Limited (hereinafter called the Bank), of the fifth part: Whereas by an agreement dated the eighteenth day of June, one thousand nine hundred and fourteen, and expressed to be made between the Borrowers by the said Hermann Lindenberger, their attorney, of the one part and the Lindenberger Cold Storage & Canning Company, Limited, a company incorporated under the English company laws and having its registered office at 27 Mincing Lane, London, ......, E. C. (hereinafter called the purchasing Company), of the other part, the Borrowers have agreed to sell and the purchasing Company has agreed to purchase the good will of the business carried on by the Borrowers and the assets of such business (except than certain book debts and cash) for a sum of one hundred and eighty-nine thousand pounds (£189,000) to be paid and satisfied as to sixty-five thousand pounds (£65,000) part thereof by the allotment of sixty-five thousand fully-paid preference shares in the purchasing company numbered 1 to 65,000, inclusive, and as to one hundred and twenty-four thousand pounds (£124,000) the residue thereof by the allotment of one hundred and twenty-four thousand fully-paid ordinary shares in the purchasing Company numbered 1 to 124,000, inclusive; and whereas the Borrowers have requested the Bank to lend to them the sum of fifteen thousand pounds (£15,000) which the Bank has agreed to do upon having the repayment thereof with interest and commission thereon at the respective rates hereinafter mentioned, secured in manner hereinafter appearing; and whereas upon the treaty for the said loan the Bank stipulated that the said Hermann Lindenberger, Bernard Lindenberger and J. Lindenberger (hereinafter collectively called the Guarantors) should concur in these presents for the purposes and in manner hereinafter appearing which they, the Guarantors, respectively agreed to do: Now this indenture witnesseth as follows:

"1. In consideration of the sum of fifteen thousand pounds (£15,000) now advanced by the Bank to the Borrowers (the receipt whereof they the Borrowers do and each of them doth hereby acknowledge and the payment whereof in manner aforesaid they, the Guarantors, do and each of them doth hereby also acknowledge) the Borrowers hereby jointly and severally covenant with the Bank to repay to the Bank on demand the said sum of fifteen thousand pounds (£15,000) and also until the whole thereof shall have been repaid to pay to the

Bank interest and also commission thereon or on so much thereof as shall not for the time being have been repaid from the date hereof at the rates hereinafter mentioned.

"2. The interest and commission to be paid by the Borrowers to the Bank as hereinbefore mentioned shall be at the rates following; that is to say, the interest shall be at the rate of six per cent. per annum and the commission shall be at the rate of one-fourth of one per cent. per calendar month or part thereof. The said interest and commission shall be payable quarterly on the thirty-first day of March, the thirtieth day of June, the thirtieth day of September and the thirty-first day of December of each year.

"3. Any such demand as is hereinbefore mentioned shall be sufficiently made if made by a notice in writing signed on behalf of the Bank by any official of the Bank and sent through the post in a prepaid letter addressed to the Borrowers, or any of them, at 31 Georgenkirch Strasse, Berlin, aforesaid.

"4. The Borrowers as beneficial owners hereby declare that the thirty thousand preference shares in the Purchasing Company numbered 1 to 30,000, inclusive (being part of the sixty-five thousand like shares to be allotted as part of the consideration for the said sale to the purchasing Company), shall stand and be charged with the payment of the principal sum, interest and commission hereinbefore covenanted to be paid, and the Borrowers hereby undertake and agree to deliver to the Bank forthwith after the said thirty thousand shares shall have been allotted the certificate or certificates for the same.

"5. The Borrowers, and each of them, hereby appoints Emil Wolff chief accountant of Reuters Telegram Company, Limited, and Arnold Wolfgang Hajduska manager of the bank, and other persons, or person, who may from time to time hold such respective offices, and each and every of them, the attorneys and attorney of the Borrowers, and each and every of them in the names of the Borrowers or names, or name, of any of them, to execute and perfect such transfers as may be necessary or thought proper to transfer the said thirty thousand shares, or any of them, after such shares have been allotted into the name of the Bank, or the names or name of any persons or person as trustee, or a trustee, for the Bank, to the intent that the shares so transferred may be more effectually made a security for the moneys intended to be hereby secured.

"6. The Borrowers and each of them hereby declare that after the said thirty thousand shares, or any of them, shall have been allotted in pursuance of the said agreement for sale they, the Borrowers, or such of them to whom such shares shall have been so allotted, or other the persons or person to whom the same, or any of them, may be so allotted shall stand possessed thereof in trust for the Bank subject to such right or equity of redemption as may for the time being be subsisting by virtue of these presents.

"7. The said Hermann Lindenberger and the said Bernard Lindenberger hereby jointly and severally undertake with the Bank that whilst any part of the principal, moneys and interest hereby secured remain due and owing neither of them will exercise the right given to them, or either of them, by the articles of association of the company of nominating and appointing a director of the company.

"8. The Guarantors hereby jointly and severally undertake and agree with the Bank that at least one-half of the said sum of fifteen thousand pounds (£15,000) together with all interest and commission for the time being payable in respect of the whole of such sum shall be paid by the Borrowers to the Bank on or before the twenty-fifth day of June one thousand nine hundred and fifteen, and that the whole of such sum with all interest and commission payable in respect thereof shall be paid by the Borrowers to the Bank on or before the twenty-fifth day of June one thousand nine hundred and sixteen, and that if the Borrowers shall not make such payments or any part thereof they, the Guarantors, or some or one of them, will make such payments to the Bank within the respective periods aforesaid.

"9. Provided always and it is hereby agreed that although as between the Borrowers and the Guarantors the Guarantors are only sureties for the Borrowers, yet as between the Guarantors and the Bank the Guarantors and each of them shall be considered as principals and a principal as regards all the obligations on the part of the Guarantors herein expressed, so that none of

the Guarantors, nor their respective heirs, executors, administrators or successors, shall be released by time being given to the Borrowers, or any of them, or any person or persons claiming through or under them, or any of them, or by any other variation in the provisions of these presents, or any other thing whatsoever whereby the Guarantors, or any of them, or their respective heirs, executors, administrators or successors as sureties or a surety only, would have been so released.

"10. This instrument is to be construed and take effect as a security made in England and in accordance with English Law.

"In witness whereof the said Hermann Lob Lindenberger as attorney for and on behalf of J. Lindenberger, Incorporated, the Lindenberger Packing Company and West Coast Trading Company, Incorporated, has hereunto set his hand and seal, and the said Hermann Lob Lindenberger on his own behalf has hereunto set his hand and seal, and Bernard Lindenberger has hereunto set his hand and seal, and the said Hermann Lob Lindenberger, as a partner in the registered firm of J. Lindenberger duly authorized in that behalf, has hereunto set his hand and seal, and Isaac Lindenberger and Nathan Lindenberger, both partners in the above firm, have hereunto set their hands and seals the day and year first above written.

"Hermann Lindenberger,<br>"As Agent and Attorney.    [Seal.]

"Signed, sealed and delivered by J. Lindenberger, Incorporated, the Lindenberger Packing Company and West Coast Trading Company, Incorporated, by Hermann Lob Lindenberger, their attorney duly authorized in that behalf, in the presence of Kenelm H. H. Smith, Cecil House, Holburn Viaduct, E. C., Solicitor.                                   Hermann Lindenberger.    [Seal.]

"Signed, sealed and delivered by Hermann Lob Lindenberger, in the presence of Kenelm H. H. Smith.                 Hermann Lindenberger,
"As Attorney.    [Seal.]

"Signed, sealed and delivered by Bernard Lindenberger, by Hermann Lob Lindenberger, his attorney duly authorized in that behalf, in the presence of Kenelm H. H. Smith.                   Hermann Lindenberger,
"Partner of the Firm of J. Lindenberger.    [Seal.]

"Signed, sealed and delivered by the said J. Lindenberger, by Hermann Lob Lindenberger, a partner in such firm duly authorized in that behalf, in the presence of Kenelm H. H. Smith.                 Isaac Lindenberger.    [Seal.]
"Nathan Lindenberger.    [Seal.]

"Signed, sealed and delivered by the above-named Isaac Lindenberger and Nathan Lindenberger, in the presence of Kenelm H. H. Smith."

It is contended by the plaintiff that the Vendor Companies had knowledge of the execution of this "security" by Hermann Lindenberger for them at the time of its execution, and that they sanctioned it. But the evidence does not support that claim. It would rather appear that Hermann Lindenberger presumed upon the good nature of his brothers, and acted in this particular without authority. It is shown that Bernard Lindenberger, president of the Vendor Companies, promptly repudiated any liability on account of this "security" agreement, upon learning of it. In so far as the Vendor Companies are concerned, the only authority for entering into this agreement was certain powers of attorney given Robert Lindenberger in March, 1913, under which powers of attorney he executed a substitution power of attorney to Hermann Lindenberger in June, 1913. The powers of attorneys executed by the Vendor Companies are in like form. The one given by the Lindenberger Packing Company is as follows:

"Know all men by these presents that Lindenberger Packing Company, a corporation duly organized, existing and carried on under the laws of the

state of Washington, does hereby make, constitute and appoint Robert Lindenberger its true and lawful attorney for and in its name, place and stead and for its use and benefit to grant, bargain, sell, remise, release, convey and quitclaim, to whom and on such terms as the said attorney may deem advisable, all of its right, title and interest, claim and demand, both in law and equity, as well in possession or in expectancy, either in whole or in part, all its properties, real, personal and mixed wherever found and of whatever nature, together with all the good will of the business, all stock on hand, all accounts due, all franchises, rights and privileges acquired by it together with machinery and any and all things connected with said business and the carrying on of same, including any fleets or boats or fishing rights or privileges or any and all things in connection with its business; and for these purposes to execute and acknowledge by deed or deeds, or any other assurance or assurances, with any covenant whatsoever as he may deem expedient, and by these presents further to receive, confirm, make, execute and deliver any contracts, deeds, conveyances or other instruments whatsoever, and for all these purposes to make and execute any release, compromise, composition, agreement or contract, by deed or otherwise, in his opinion necessary and expedient in the premises, and generally to do and perform all matters and things, transact all business, make, execute and deliver all contracts, orders, deeds, assignments and other rights and assurances and instruments of every kind which may be requisite or proper and necessary to effectuate all or any of the premises; to receive, receipt for and quittance give for any moneys, certificates of stock or other things of value in its name, and for its use and benefit, in connection with the premises, with the same power to all intents and purposes and with the same validity as it could do if personally present.

"Giving and granting unto its said attorney full power to substitute one or more attorneys under him with full power of revocation at his pleasure, hereby ratifying and confirming whatever its said attorney or a substitute shall or may do by virtue of these presents in the premises.

"In witness whereof, the said Lindenberger Packing Company has caused these presents to be executed, signed by its president and its seal attached hereto, on this 20th day of March, 1913, by authority of the board of directors heretofore duly passed.                   Lindenberger Packing Co.,
                    "By B. Lindenberger, President.  [Corp. Seal.]

"Signed and sealed in the presence of
    "G. E. Pain,
    "C. G. Rose.

"State of Washington, County of King—ss.:
    "This certifies that before me, a notary public, within the above-named county and state, personally appeared Bernard Lindenberger, as president of the Lindenberger Packing Company, who is known to me to be the identical individual who as such president executed the foregoing power of attorney and instrument in writing and who acknowledged to me that he executed the same as such president by order of the board of directors and for the uses and purposes as therein set forth.  March 23, 1913.        E. S. Dungan,
    "[Notarial Seal.]                     Notary Public for Washington."

The evidence shows that no part of the £15,000 loaned upon the security passed, directly or indirectly, to either the defendants or the Vendor Companies. It is shown that it was taken by Mr. Smith, the solicitor of the bank, to Berlin and delivered to I. Lindenberger, father of Hermann Lindenberger and head of the German firm of J. Lindenberger, of which Hermann Lindenberger was a member. This firm at that time was indebted to the Vendor Companies, and still is indebted to the defendant company in a considerable amount.

[5] Powers of attorney are strictly construed. 31 Cyc. 1407. The authority given by the powers of attorney was to sell. Such a power can give no right to borrow. There is no evidence that this £15,000

was in any way a part of the purchase price given by the plaintiff for the holdings of the Vendor Companies. The fact that the Berlin firm also executed the security is inconsistent with its being part of the purchase price.

[6] The plaintiff and bank had full knowledge of the relation of Hermann Lindenberger, both as to the Vendor Companies and his interest in the German firm. Even were the power of attorney broad enough to include the power to borrow, he could not use the power to borrow for himself or the firm in Berlin. American Surety Co. v. Pauly, 170 U. S. 133, at 156, 18 Sup. Ct. 552, 42 L. Ed. 977. The bank also knew that a week before the execution of this "security" the contract for the sale of all of the property of the Vendor Companies to the plaintiff had been executed. Under these circumstances, the defendants are not required, in equity, to return any part of this loan.

Hermann Lindenberger, as a part of the security for the £15,000, deposited with the bank 30,000 preference shares of the plaintiff company belonging to him. Specific performance being denied, these shares are, of course, worthless; but Hermann Lindenberger was the owner of an interest in the Vendor Companies, the exact extent of which does not appear. All interests in these companies have, under the evidence, been preserved in the defendant company.

Upon the intervention of the bank, the decree may provide that no part of the interest of Hermann Lindenberger, or the German firm—either shares of stock or dividends—the extent of which to be fully disclosed, shall be paid, assigned, or transferred, or recognized by the defendant company, until such time as the liability of Hermann Lindenberger and the German firm to the bank, on account of the security, shall be ascertained, which questions, on account of their being subjects of countries opposed in war, cannot be determined until the end of the war. This stay should expire within a reasonable time after the conclusion of peace.

[7] Upon the same day that the sale contract was executed, the specific performance of which is sought, the following contract was entered into between the plaintiff and the Crescole Syndicate, Limited:

"This agreement made the eighteenth day of June one thousand nine hundred and fourteen, between Hermann Lindenberger, of Berlin, at present residing at the Hotel Cecil, London, as agent for and on behalf of J. Lindenberger, Incorporated, The Lindenberger Packing Company and West Coast Trading Company, Incorporated, being companies incorporated under the laws of the states of Oregon and Washington in the United States of America (hereinafter called the proposed Vendors) of the first part, J. Lindenberger, of 31 Georgenkirch Strasse, Berlin, aforesaid, a firm duly registered according to German law, of the second part, and Crescole Syndicate, Limited, whose registered office is at Cecil House, Holburn Viaduct, in the city of London (hereinafter called the Syndicate) of the third part: Whereas the proposed Vendors carry on business in the United States of America and they are desirous that an English Company (hereinafter referred to as the proposed Company) should be formed under the Companies Acts 1908 and 1913, for the purpose of acquiring their said business and the assets thereof; and whereas with a view to the acquisition of the said businesses by the proposed Company the proposed Vendors are desirous that the Syndicate should promote the proposed Company and should arrange to find such sums as are necessary to provide the

expenses of the registration formation and flotation of the proposed Company which the Syndicate has agreed to do but as a condition of its so doing the Syndicate has stipulated that the proposed Company should when formed enter into the agreement on its part with the Syndicate hereinafter mentioned, and that the proposed Vendors and the said J. Lindenberger should enter into such agreements on their respective parts as are hereinafter expressed; and whereas it is intended that the proposed Company should have a nominal capital of two hundred and fifty thousand pounds divided into one hundred and twenty-five thousand cumulative participating preference shares (hereinafter referred to as preference shares) of one pound each and one hundred and twenty-five thousand ordinary shares of one pound each; and whereas the draft of the memorandum and articles of association of the proposed Company have been prepared and a copy thereof has for purposes of identification been signed by Kenelm Henry Hallett Smith, a solicitor of the Supreme Court; and whereas it is intended that the good will of the said businesses of the proposed Vendors and all the assets thereof (other than and except certain book debts and cash) should be sold to the proposed Company and that the consideration for such sale should be the sum of one hundred and eighty-nine thousand pounds to be paid and satisfied as to sixty-five thousand pounds part thereof by the allotment of sixty-five thousand fully-paid preference shares of one pound each in the proposed Company, and as to one hundred and twenty-four thousand pounds the residue thereof by the allotment of one hundred and twenty-four thousand fully paid ordinary shares of one pound each in the proposed Company; and whereas the draft of the agreement for sale to the proposed Company has been prepared and has for purposes of identification also been signed by the said Kenelm Henry Hallett Smith; and whereas the said draft agreement for sale contains amongst other clauses a clause (hereinafter referred to as the dividend guarantee clause) by which in effect the proposed Vendor and the said J. Lindenberger undertake to guarantee that the profits of the proposed Company shall for the period of five years therein mentioned be sufficient to pay a dividend at the rate of seven per cent. per annum on the capital for the time being paid up on the preference shares in the proposed Company which may for the time being have been issued, and secure such guarantee by a charge on fifteen thousand of the said preference shares and fifty thousand of the ordinary shares to be allotted as part of the purchase consideration for the said sale: Now these presents witness as follows:

"1. The Syndicate agrees that it will in due course promote and register the proposed Company under the Companies Acts 1908 and 1913, having the capital hereinbefore mentioned and with a memorandum and articles of association in the form, of the draft memorandum and articles of association hereinbefore referred to, with such modifications (if any) as may be agreed to by the proposed Vendors.

"2. The proposed Vendors agree that they will, when the proposed Company has been incorporated, enter into an agreement for the sale of their said businesses and the assets thereof (except as hereinbefore mentioned) in the terms of the draft agreement for sale hereinbefore referred to with such modifications only therein as may be agreed to by the Syndicate.

"The proposed Vendors and the said J. Lindenberger respectively undertake and agree that as soon as the proposed Company is entitled to commence business it will enter into an agreement with the Syndicate substantially in the terms of the draft agreement set out in the schedule hereto, with such modifications only therein as may be approved by the parties hereto, and the Syndicate hereby agrees that if the proposed Company is formed and within one week from the date hereof has become entitled to commence business and is willing to enter into such agreement as is mentioned in this clause, the Syndicate on its part will enter into such agreement with the proposed Company.

"4. The proposed Vendors and the said J. Lindenberger hereby jointly and severally undertake that at least one-half of the sums to become payable by the proposed Company to the Syndicate under the said agreement to be entered into as aforesaid between the proposed Company and the Syndicate, together with all interest and commission for the time being, payable in re-

spect of the whole of such sums, shall be paid by the proposed Company to the Syndicate on or before the expiration of one year from the date of the incorporation of the proposed Company, and that the whole of such capital sums and all interest and commission payable in respect thereof shall be paid by the proposed Company to the Syndicate on or before the expiration of two years from the date of the incorporation of the proposed Company, and that if the proposed Company shall not make such payments, or any part thereof, within the periods aforesaid they, the proposed Vendors, and J. Lindenberger, or some or one of them, will make such respective payments to the Syndicate within the respective periods aforesaid.

"5. As consideration for the services to be rendered by the Syndicate the proposed Vendors agree that they will cause to be allotted or will transfer to the Syndicate, or as the Syndicate shall direct, six thousand five hundred of the said sixty-five thousand preference shares in the proposed Company and also twelve thousand four hundred of the one hundred and twenty-four thousand fully paid-up ordinary shares in the proposed Company to be allotted as part of the consideration for the proposed sale to the proposed Company.

"6. If within one calendar month from the date hereof the proposed Company is not incorporated and entitled to commence business or if though so incorporated and entitled to commence business within that period the proposed Company does not within six weeks from the date hereof enter into an agreement with the Syndicate in the terms of the draft agreement set forth in the schedule hereto with such modifications (if any) as may be approved by the proposed Vendors, then the proposed Vendors and the said J. Lindenberger jointly and severally agree with the Syndicate that they, or some or one of them, will pay to the Syndicate the sum of not exceeding one thousand five hundred pounds as a consideration for the expenses it will have been put to.

"7. This agreement is to be construed and take effect as a contract made in England and in accordance with the law of England.

"In witness whereof the said Hermann Lindenberger, as agent for and on behalf of J. Lindenberger, Incorporated, the Lindenberger Packing Company and West Coast Trading Company, Incorporated, has hereunto set his hand and seal, and the said J. Lindenberger have hereunto set their hand and seal, and the Company has caused its common seal to be hereunto affixed the day and year first above written.

### "The Schedule Above Referred to.

"This agreement made the 18th day of June, one thousand nine hundred and fourteen, between the Lindenberger Cold Storage & Canning Company Limited (hereinafter called the Company) of the one part and Crescole Syndicate, Limited (hereinafter called the Syndicate) of the other part: Whereas the Company has been formed and incorporated under the Companies Acts 1908 and 1913 with a capital of two hundred and fifty thousand cumulative participating preference shares (hereinafter called preference shares) of one pound each and one hundred and twenty-five thousand ordinary shares of one pound each; and whereas by an agreement (hereinafter referred to as the sale agreement) dated the 18th day of June, one thousand nine hundred and fourteen, and expressed to be made between J. Lindenberger, Incorporated, the Lindenberger Packing Company and the West Coast Trading Company (therein and hereinafter called the Vendor Companies) by Hermann Lindenberger, their attorney, of the one part, and the Company of the other part, the Vendor Companies have agreed to sell and the Company has agreed to purchase the good will of the businesses (except as in the sale agreement is mentioned) for a sum of one hundred and eighty-nine thousand pounds to be paid and satisfied as to sixty-five thousand pounds part thereof by the allotment of sixty-five thousand fully-paid preference shares in the Company and as to one hundred and twenty-four thousand pounds the residue thereof by the allotment of one hundred and twenty-four thousand fully-paid ordinary shares in the Company; and whereas the Company is desirous of making arrangements which will enable the expenses of and incidental to the incorporation and formation of the Company to be provided and of also making

such arrangements as are hereinafter mentioned in relation to the issue of the balance of the said preference shares beyond those which by the sale agreement are to be allotted in satisfaction of the purchase consideration for the said sale, and with a view thereto the Company and the Syndicate have agreed to enter into such agreement as is hereinafter expressed: Now these presents witness that it is hereby agreed as follows:

"1. The Syndicate agrees that it will pay, satisfy and discharge all the expenses of and incidental to the negotiation, preparation and execution of these presents the sale agreement and the memorandum and articles of association of the Company and the formation and registration of the Company, the completion of the said sale and the transfer to the Company of the premises by the sale agreement agreed to be sold to the Company other than and except any fees in respect of such transfer which are or may be payable in the United States of America, which last-mentioned fees it is hereby expressly declared are to be payable and paid by the Company.

"2. In consideration of the agreement on the part of the Syndicate contained in the preceding clause the Company agrees to pay to the Syndicate the sum of five thousand pounds and also until payment to pay to the Syndicate interest and also commission thereon, or on so much thereof as shall for the time being remain unpaid from the date of these presents at the rates hereinafter mentioned.

"3. The Company agrees that until the thirty-first day of December, one thousand nine hundred and fifteen, the Syndicate shall be at liberty to require the Company to issue a prospectus offering to the public any of the said preference shares in the Company which shall for the time being not have been issued and to employ the Syndicate to issue such prospectus accordingly.

"4. If at any time before the said thirty-first day of December, one thousand nine hundred and fifteen, the Syndicate shall require the Company to issue such prospectus as is named in the last preceding clause the Syndicate agrees that it will undertake the issue of such prospectus on behalf of the Company, and will cause the same to be advertised and circulated in a sufficient and effective manner, and that it will in due course, after the issue of such prospectus for and on behalf of the Company apply for and use its best endeavors to obtain a settlement and official quotation on the London Stock Exchange for the shares to be offered by such prospectus, and that it will pay, satisfy and discharge all the expenses of and incidental to the issue, advertisement and circulation of such prospectus and the issue of the shares applied for in response to such prospectus and the said application for such a settlement and official quotation as aforesaid.

"If the Syndicate shall before the date aforesaid require the Company to issue such a prospectus as aforesaid the Company agrees to pay to the Syndicate as consideration for the services to be rendered and the work to be done by the Syndicate under the provisions of the last preceding clause the further sum of five thousand pounds and also until payment to pay to the Syndicate interest and also commission thereon or on so much thereof as shall for the time being remain unpaid from the date of the issue of the said prospectus at the rates hereinafter mentioned.

"6. The interests and commission to be paid by the Company to the Syndicate as hereinbefore mentioned shall be at the rates following; that is to say, the interest shall be at the rate of six per centum per annum and the commission shall be at the rate of one-fourth of one per centum per calendar month or any part thereof. The said interests and commissions shall be payable quarterly on the thirty-first day of March, the thirtieth day of June, the thirtieth day of September, and the thirty-first day of December in each year.

"7. If the Syndicate shall before the date aforesaid require the Company to issue such a prospectus as aforesaid the Company agrees that the sums to be received in respect of the issue of the shares to be offered by the said prospectus shall be applied so far as they are required for such purposes in payment or repayment to the Syndicate of the said two sums of five thousand pounds and the interest and commission thereon.

"8. If the Syndicate shall, before the date aforesaid, require the Company to issue such a prospectus as aforesaid no part of the shares to be offered to the public by such prospectus which may not be applied for in response to

such prospectus shall so long as any part of the said two sums of five thousand pounds or any interest or commission on such respective sums or any part thereof shall remain due to the Syndicate afterwards be issued or sold, or otherwise disposed of by the Company, except on the terms that the proceeds of such shares shall be applied so far as may be required in payment to the Syndicate of so much of the said respective sums and the interest and commission thereon as shall remain due to the Syndicate.

"9. If the Syndicate shall not, before the date aforesaid, require the Company to issue such a prospectus as aforesaid, none of the said preference shares shall so long as any part of the first-mentioned sum of five thousand pounds or any interest or commission on such sum remains due to the Syndicate, be issued or sold or otherwise disposed of by the Company after the said thirty-first day of December, one thousand nine hundred and fifteen, except on the terms that the proceeds of such shares shall be applied so far as they may be required in payment to the Syndicate of so much of such sum of five thousand pounds and the interest and commission thereon as shall remain due to the Syndicate.

"10. Any prospectus to be issued to the public in relation to the said Preference Shares shall be approved by both parties hereto.

"In witness whereof the Companies have caused their respective common seals to be hereunto affixed the day and year first above written.

"Hermann Lindenberger,
"Agent and Attorney. [Seal.]

"Signed, sealed and delivered by the above-named Hermann Lindenberger as agent for and on behalf of the above-named J. Lindenberger, Incorporated, the Lindenberger Packing Company and West Coast Trading Company, Incorporated. in the presence of William E. Stone, Cecil House, Holburn Viaduct, E. C., Solicitor's Clerk.
Hermann Lindenberger,
"Partner in firm of J. Lindenberger. [Seal.]

"Signed, sealed and delivered by Hermann Lindenberger, a partner in the above-named firm of J. Lindenberger, duly authorized to sign on behalf of such firm, in the presence of William E. Stone.

"The common seal of Crescole Syndicate, Limited, was hereunto affixed in the presence of A. W. Hajduska, Director and Secretary. [Seal.]"

The Crescole Syndicate is a corporation controlled by Reuters Bank, organized for the purpose of carrying out transactions deemed not advisable to be carried out by the bank directly, a promoting syndicate financed by the bank. Although the evidence was not clear and the transcript of it does not agree with my recollection, the impression gained by me from such evidence was that the receipts from the transactions by the Syndicate "found their way" to the bank. Mr. Hajduska, manager of the bank, was the sole director, manager, and secretary of the Syndicate.

On account of the trouble in Ireland in the summer of 1914, and the further fact that the summer was a dull time, so far as business was concerned, Mr. Hajduska counseled delaying until winter for the issuance of the prospectus and offering of preference shares to the public, provision for which was made in this agreement, the bank to finance the business in the meantime. The war intervened; the Syndicate did not require the issuance of the prospectus offering such shares to the public, and no such shares have been sold.

As this contract is dependent upon the main contract, in which specific performance has been denied, its performance becomes impossible.

It is contended that the £5,000 mentioned in paragraph 2 of the contract have been earned; that, though it was contemplated that it

should be paid from the proceeds of the sale of preference shares to be ·offered the public, that method of payment becoming impossible upon the denial of specific performance of the main contract, equity requires the payment of that amount to the Syndicate as a condition of the denial of specific performance.

It is shown that, in the payment of stamp taxes, fees, and charges connected with the incorporation and registration, the Syndicate paid in "out of pocket expenses" £750. .Equity requires the payment of this amount with interest at 6 per cent. from the date of incorporation, June 15, 1914.

Some portion of the remaining £4,250 of this item has doubtless been earned, in the way of services in connection with the incorporation of the plaintiff company and the matters referred to in paragraph 1 of the contract, but it is clearly apparent that something besides the mere labor in connection with this matter was involved.

As already stated, one of the chief objects of the Vendor Companies in creating the English company was to establish a London credit. The officers of the Syndicate, who were to acquire shares of stock under the agreement and be paid the money in question, were the officers of the bank relied upon for the desired credit. It is shown that Mr. Smith, in all these transactions, acted as the solicitor for the bank and the Syndicate, as well as for the Lindenberger Company. In connection with service of incorporating and registering the plaintiff company, Hermann Lindenberger promised and delivered to Mr. Smith 2,000 common shares of the new company. Hermann Lindenberger testifies that these shares were given to Mr. Smith to pay for these services, and some fault is found with the manner in which certain of these services were discharged.

As Mr. Smith was the regular solicitor for both the bank and the Syndicate, it is not to be expected that the Lindenbergers, their interests being opposed to those of the bank and Syndicate, would obtain any undue advantage in these matters, especially as Hermann Lindenberger, who represented them, was not well versed in the English language. Mr. Smith testifies that the 2,000 shares were not in payment of his services, but a present made to him by Hermann Lindenberger; that he only represented the bank and the Syndicate and that he obtained the consent of his principals before accepting the 2,000 shares; that, at the beginning of the incorporation, he advised Hermann Lindenberger to secure some one else to represent him, but that Hermann Lindenberger expressed himself as satisfied to leave the matter entirely in the hands of Mr. Smith. Hermann Lindenberger denies that he was so advised. Mr. Weiss, chairman of the board of directors of the plaintiff company, testifies that he heard Mr. Smith so advise Mr. Lindenberger. I am inclined to reject the testimony of Mr. Weiss .in this matter, for the reason that, in the positive and detailed account that he gave of another matter, concerning a certain £200 left with him by Hermann Lindenberger, intended by the latter in payment of the 200 qualification shares allotted to Hermann Lindenberger and Bernard Lindenberger, on account of the directorship of each, he was thoroughly discredited. I am further so inclined because of the

fact that Weiss was not connected with the transactions in question at the beginning, when, it is claimed, Mr. Smith advised Hermann Lindenberger to secure a representative on his own behalf. This leaves Hermann Lindenberger's denial only opposed by Mr. Smith's statement. Mr. Smith fails to sustain the burden resting upon him under these circumstances.

For the foregoing reasons I am inclined to the belief that the consideration for the £5,000 promised the Syndicate was not clearly expressed. The fact that it was to be paid out of the proceeds of preference shares to be sold the public by the Syndicate itself shows, at least, part of the consideration to have been the securing of further credit. If, as Mr. Smith says, Mr. Lindenberger gave him gratuitously the 2,000 shares, he being the mere solicitor of the bank, it is not unreasonable to suppose that, in dealing with the officers in direct control of the credit to be extended by that institution, Mr. Lindenberger would be still more generous, and that his gratitude was not only for past benefits, but, in part, actuated by a lively sense of favors to come.

For these reasons, the justice of the claim to that part of the £5,000 in excess of the £750 for out of pocket expenses is not established with sufficient certainty to warrant the court in imposing its payment as a condition in denying specific performance.

In concluding that this consideration was not clearly expressed, and in giving effect to the fact that, in this transaction, Hermann Lindenberger was only represented by Mr. Smith, the regular solicitor of the bank and Syndicate, I have been influenced by another dispute which has arisen: The contract for the sale of the property of the Vendor Companies to the plaintiff, already set out, provides the manner in which the consideration shall be paid the Vendor Companies, and, in this connection, contains the following provision:

"The residue of the consideration shall be the amount expended by the Vendor Companies respectively before the first day of June, one thousand nine hundred and fourteen, in making preparation for the new season's pack over and above the value of twenty thousand dollars which is to be for the benefit of the Company. Such amount if not otherwise agreed on is to be determined by a single arbitrator in accordance with the Arbitration Act 1889, provided that the Company shall only be called upon to make such payment as and when it receives funds through the sale of *its stock*."

Mr. Smith testified that "stock" was intended to mean the output of the companies in the way of fish, while the defendants contend that the 60,000 preference shares to be sold by the Syndicate were in contemplation. Either Mr. Smith is wrong in his interpretation, or the minds of the parties did not meet. Owing to the fact that Mr. Smith undertook to represent all of the conflicting interests, I conclude that the minds of the parties did not meet in this particular.

Mr. Winfree, of the Portland firm of attorneys engaged by plaintiff in the summer of 1914 to attend to matters arising in America in connection with the transfer of the property of the Vendor Companies, did a considerable amount of work before it became apparent that the property would not be transferred to the English corporation. I find the reasonable value of these services to be $2,500, which

is required to be paid by defendants as a condition of the denial of specific performance.

The plaintiff company engaged an office of Mr. Weiss, and were furnished clerical services by him. He also paid for certain stationery for the company, and was to receive, as chairman of the board of directors, £250 per annum. These items for six months, which is, approximately, the time elapsing from the formation of the company, in June, 1914, until the Seattle meeting, in December, when it became apparent that the defendants would, owing to the war, only proceed upon the basis of an American company, amount to £210. He will be allowed nothing on account of his attending the trial.

Many minor issues have been discussed, but I have not considered it necessary to state them. They are controlled by the foregoing. The amounts have been stated in pounds, rather than dollars, to make round sums.

The decree will, of course, be put in terms of dollars. Specific performance being denied, an accounting will also be denied.

If the bank intervenes and accepts the foregoing terms, the debentures are to be surrendered and canceled and all title papers held by the plaintiff and bank are to be likewise surrendered. Interest will be allowed at 6 per cent. upon the items found due Mr. Weiss and the syndication from the time the same became due. Upon deposit of these amounts in the registry of the court, interest to stop, and, if the deposits remain in the registry of the court three months, unaccepted, they may be withdrawn by the defendants, unless otherwise ordered, without interest running further. Upon the acceptance of the amounts allowed Mr. Weiss, the Syndicate and Mr. Winfree's firm (Teal, Winfree & Minor), they are to give full acquittance and discharge of all claims against the defendants.

Costs on account of reporting the case and the transcript of the evidence, and any other like items, to be divided equally. Costs not allowed either party.